**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HARTFORD INSURANCE
COMPANY OF THE MIDWEST,
Plaintiff-Appellant,

v.                                                             No. 98-2701

AMERICAN AUTOMATIC SPRINKLER
SYSTEMS, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-97-976-AMD)

Argued: October 26, 1999

Decided: January 18, 2000

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Jeffrey Allan Wothers, NILES, BARTON & WILMER,
Baltimore, Maryland, for Appellant. Kevin Bock Karpinski, ALLEN,
JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for
Appellee. **ON BRIEF:** Jason C. Brino, NILES, BARTON & WIL-
MER, Baltimore, Maryland, for Appellant. Daniel Karp, ALLEN,

JOHNSON, ALEXANDER & KARP, Baltimore, Maryland, for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

We are presented with the question of whether "contractor," as used in Maryland's 10-year statute of repose granting immunity from suits arising from improvements to real property, includes subcontractors. See Md. Code Ann., Cts. & Jud. Proc.§ 5-108(b). We hold that it does and therefore affirm the district court's entry of summary judgment in favor of a sprinkler-system subcontractor for claims arising from work it performed in 1982. We also affirm the district court's judgment that claims arising out of more recent renovation work done by the subcontractor were not supported by any evidence.

I

On February 7, 1996, at the Holiday Inn in Timonium, Maryland, a cap and a coupling on a sprinkler-system standpipe located in the stairwell of the hotel broke, causing extensive flooding which damaged the hotel's stairwell, halls, guest rooms, atrium, and exterior facade. The hotel's building engineer, Paul Seekford, shut off the water main and immediately began a general cleanup. He also retained American Automatic Sprinkler Systems, Inc. ("American Sprinkler") to make repairs to the standpipe. Two American Sprinkler employees arrived at the hotel and noticed that the cap on the top of the standpipe had blown off and that the fire hose valve, located halfway down the standpipe, had cracked. They concluded that the pipe had frozen.* They replaced the damaged section of the standpipe and the other damaged parts, and presented Seekford with a work order,

_____

*During the period before the flooding incident, Timonium had experienced unusually cold winter temperatures, and there was evidence that in the stairwell area where the standpipes were located, 1/8-inch standard single-pane glass had been installed in lieu of the 5/8-inch insulated glass that had been called for by the Holiday Inn's construction drawings.

2

which he signed. The work order described the repairs and stated that the cause of the standpipe cap's separation from the standpipe was "extreme cold and inadequate heat in stairs." When the American Sprinkler employees left, they took with them the damaged parts.

Shortly after the American Sprinkler employees left, an adjuster for Hartford Insurance Company of the Midwest ("Hartford"), the hotel's insurance company, instructed Seekford to retrieve the damaged parts from American Sprinkler. Although Hartford claims that American Sprinkler gave repeated assurances that the damaged parts would be returned to Holiday Inn, a claim that American Sprinkler disputes, American Sprinkler later informed Hartford that the damaged parts were no longer in its possession because it had thrown them into a trash dumpster in the ordinary course of business.

Hartford brought this subrogation action against American Sprinkler seeking to recover $1.6 million in damages resulting from the February 7 flooding incident. Hartford alleged that the flooding was caused either by American Sprinkler's faulty construction and installation of the standpipe and sprinkler system in 1982, when the Holiday Inn was originally constructed, or by American Sprinkler's negligent renovation of the sprinkler system, completed a couple of weeks before the flooding incident. The complaint, based on diversity jurisdiction, relied on theories of negligence, strict liability, and breach of contract under Maryland law.

On cross-motions for summary judgment, the district court entered judgment in favor of American Sprinkler and against Hartford. See Hartford Ins. Co. of the Midwest v. American Automatic Sprinkler Systems, Inc., 23 F. Supp. 2d 623, 630 (D. Md. 1998). It ruled that any claims arising out of American Sprinkler's installation of the sprinkler system in 1982 were barred by Maryland's statute of repose, Md. Code Ann., Cts. & Jud. Proc. § 5-108(b). It rejected Hartford's claim that American Sprinkler's disposal of the damaged standpipe parts warranted, under the doctrine of spoliation, judgment as a matter of law or an inference adverse to American Sprinkler. Finally, it concluded that Hartford failed to present any evidence that American Sprinkler was negligent or breached its contract in performing the 1996 repairs to the sprinkler system.

This appeal followed.

II

Hartford's principal argument on appeal is that the district court improperly defined "contractor," as used in Maryland's statute of repose, to include subcontractors. It argues that because the term "contractor" is not understood in the construction industry to describe subcontractors, the district court erred by creating a fourth class of persons immune under the statute -- subcontractors-- when the statute provides for only three: architects, engineers, and contractors. Hartford urges us to interpret the term "contractor" in accordance with the usage of the American Institute of Architects ("AIA") in its recommended contract forms, which define a contractor as "the person or entity identified as such in the Agreement and . . . referred to throughout the Contract Documents as if singular in number." American Institute of Architects, General Conditions of the Contract for Construction, art. 3.1.1 (1997). Hartford also notes that Maryland's mechanic's lien statute, which distinguishes between contractors and subcontractors, demonstrates that the terms have distinct meanings under Maryland law. That statute defines a contractor as "a person who has a contract with an owner," and defines a "subcontractor" as "a person who has a contract with anyone except the owner or his agent." Md. Code Ann., Real Prop. § 9-101. Finally, Hartford points to a similar distinction made by the Maryland Court of Appeals in Roland v. Lloyd E. Mitchell, Inc., 155 A.2d 691, 693-96 (Md. 1959). Accordingly, it argues that the Maryland General Assembly's intent in passing the statute of repose was to provide a shorter period of exposure to liability for those persons in direct privity with the owner of real property than for "subcontractors."

In rejecting these arguments, the district court interpreted the plain meaning of the term "contractor" to include as a subset any "subcontractor." It noted that this definition of "contractor" was consistent with the intent of the statute "to shield those connected to the design and construction of an `improvement to real property.'" 23 F. Supp. 2d at 629.

Reviewing this issue of statutory construction de novo, see Scrimgeour v. Internal Revenue Serv., 149 F.3d 318, 326 (4th Cir.

4

1998), we must determine whether subcontractors enjoy the heightened protection from liability that Maryland's statute of repose confers on "any architect, professional engineer, or contractor," Md. Code Ann., Cts. & Jud. Proc. § 5-108(b). The Maryland courts have not decided this precise issue. As with the interpretation of any legislative enactment, our analysis must begin with the language of the statute. If the statute conclusively reveals the intent of the Maryland General Assembly, our analysis ends. See Rose v. Fox Pool Corp., 643 A.2d 906, 909-10 (Md. 1994).

The Maryland statute of repose grants immunity from suit based on alleged defects in improvements to real property by providing for repose after a 20-year period for all persons. The statute affords heightened protections to a defined class -- architects, professional engineers, and contractors -- by providing for repose after 10 years. The statute states in relevant part:

> (a) <u>Injury occurring more than 20 years later</u>. -- Except as provided by this section, no cause of action for damages accrues and a person may not seek contribution or indemnity for damages incurred when wrongful death, personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use.

> (b) <u>Action against architect, professional engineer, or contractor</u>. -- Except as provided by this section, a cause of action for damages does not accrue and a person may not seek contribution or indemnity from any architect, professional engineer, or contractor for damages incurred when wrongful death, personal injury, or injury to real or personal property, resulting from the defective and unsafe condition of an improvement to real property, occurs more than 10 years after the date the entire improvement first became available for its intended use.

Md. Code Ann., Cts. & Jud. Proc. § 5-108(a), (b).

5

We agree with the district court that the plain meaning of the statutory term "contractor" encompasses subcontractors. This conclusion is confirmed by reference to any dictionary. For example, "contractor" is defined by one dictionary as "one that contracts, a party to a bargain, one that formally undertakes to do so something for another," or as "one who contracts on predetermined terms to provide labor and materials and to be responsible for the performance of a construction job in accordance with established specifications or plans." Webster's Third International New Dictionary 495 (1961). Similarly, Black's Law Dictionary describes the term "contractor" as

> strictly applicable to any person who enters into a contract, but . . . commonly reserved to designate one who, for a fixed price, undertakes to procure the performance of works or services on a large scale . . . generally classified as general contractors (responsible for entire job) and subcontractors (responsible for only a portion of job; e.g., plumber, carpenter).

Black's Law Dictionary 295 (5th ed. 1979).

An inclusive definition of "contractor" is consistent with the apparent purpose of § 5-108(b) to insulate from liability for latent defects those parties responsible for the design and construction of improvements to real property. The original version of the statute, passed in 1970 and providing for repose after a 20-year period, was "an attempt to relieve builders, contractors, landlords, and realtors of the risk of latent defects in design, construction, or maintenance of an improvement to realty." Allentown Plaza Assocs. v. Suburban Propane Gas Corp., 405 A.2d 326, 330 (Md. Ct. Spec. App. 1979) (quoting Revisor's Note to Md. Code Ann., Cts. & Jud. Proc. § 5-108 (1974)). The Maryland General Assembly passed the original version of the statute, declining to include proposed language that would have limited the statute's protections to "`persons performing or furnishing the design, planning, supervision of construction or construction' of an improvement." Rose, 643 A.2d at 913 (quoting identical language contained in four Senate Bills and one House Bill proposed in 1967, 1968, and 1969). In 1979, the General Assembly amended § 5-108 to confer heightened protection on architects and engineers in the form of a 10-year repose period, "[i]n apparent response" to complaints from archi-

6

tects and engineers that the existing 20-year repose period provided them insufficient protection from liability. Id . And in 1980, the General Assembly added contractors to the list of parties afforded heightened protection under § 5-108(b). See id .

As the Maryland Court of Appeals explained in Rose, "two developments in the law -- the elimination of the `privity of contract' doctrine as a defense and the application of the `discovery rule' [when applying a statute of limitations] -- provided the impetus behind the enactment of [the statute of repose]." Id. at 911 (footnote omitted). These changes in tort law had the effect of dramatically expanding the liability of persons designing or constructing improvements to real property. See id. Hartford's argument that the heightened protection of § 5-108(b) was meant to apply only to those in privity of contract with the owner of realty is at odds with the legislative motivation behind the statute, as characterized by the Maryland Court of Appeals. The impetus behind the legislation appears to have come from a concern about legal developments that expanded liability to those not in privity with the owners of real property. Consistent with this concern, § 5-108(b) explicitly granted heightened protections to "any architect, professional engineer, or contractor," without reference to whether the owner of real property had directly contracted with the party performing the improvement or not. Md. Code Ann., Cts. & Jud. Proc. § 5-108(b) (emphasis added).

Hartford's argument, that we should read § 5-108(b) to import distinctions made in the construction industry between contractors and subcontractors, is unpersuasive. In each of the sources to which Hartford points -- AIA contracts, the mechanic's lien laws, and related court decisions -- the contract or statute involved focuses on the distinction between a general contractor and a subcontractor in furtherance of the regulation of the relationship between the two. The AIA recommends a different contract form for each participant in a construction project, including the architect, general contractor, construction manager, and subcontractor, reflecting the distinct role each performs. Similarly, the thrust of the mechanic's lien law is to provide protection to contractors and specified subcontractors who are in privity with the construction project but not with its owner. The purpose of the statute of repose, in contrast, would not be fulfilled by observing a distinction between general contractors and subcontractors. On

7

the contrary, because it was meant to address the problem of increased liability arising from construction projects, <u>particularly for subcontractors</u> who were not in privity with owners but who no longer could raise lack of privity as a defense, the statute of repose should be construed to provide protection for <u>all</u> contractors.

Moreover, it would make little sense to provide protection to a general contractor who provided a specific improvement to real property, such as landscaping, but to withhold the same protection from another person hired by the general contractor to perform the same task. Every indicator suggests that the Maryland General Assembly did not intend to distinguish between a contractor and a subcontractor when it enacted the statute of repose. On the contrary, by using the all-inclusive phrase "<u>any</u> contractor," it afforded protection to all contractors, including subcontractors.

Because American Sprinkler contracted to provide improvements to real property at the Holiday Inn -- by installing the sprinkler system in 1982 -- it is a "contractor" that became immune from suit ten years after the entire hotel first became available for its intended use. <u>See</u> Md. Code Ann., Cts. & Jud. Proc. § 5-108(b).

III

Our ruling -- that claims relating to alleged improper installation of the sprinkler system in 1982 are barred by Maryland's statute of repose -- does not dispose of Hartford's claims arising from the repairs American Sprinkler completed in January 1996, less than two weeks before the cap and coupling on the standpipe broke and caused the flooding of the Holiday Inn. Hartford contends that in reviewing these claims, the district court did not consider the facts in the light most favorable to Hartford and improperly failed to draw inferences adverse to American Sprinkler because of its spoliation of evidence.

In mid-January 1996, American Sprinkler began renovations of the automatic sprinkler system at the Holiday Inn, completing them on January 26, 1996. Holiday Inn had to perform several upgrades to its facility, including the renovation of its sprinkler system, to obtain "Holiday Inn Select" status. The hotel contracted with American Sprinkler to perform the sprinkler-system renovations, which required

8

replacement of the escutcheon plates underneath the sprinkler heads. The sprinkler system was designed to be drained zone-by-zone, without disturbing the entire sprinkler system, and the renovation required American Sprinkler employees to drain the areas of the system where they worked. The renovations did not involve work on the standpipe risers, however, and did not require employees to work in the stairwells where the standpipe risers were located.

Hartford advances a theory that American Sprinkler drained and repressurized the entire sprinkler system each day when performing the renovations, and that this activity somehow weakened the standpipe cap and coupling that ultimately broke on February 7, causing the flooding. But Hartford offers no evidence either that daily draining and repressurization occurred or that a properly constructed standpipe would break or separate as a result of such draining and repressurization. At most, Hartford's evidence -- the testimony of the hotel's building engineer that American Sprinkler employees asked him on one occasion to open a water valve under the stairwell -- demonstrates that the entire system may have been drained and repressurized on one occasion. But Hartford presented no evidence that this draining and repressurization would overtax a properly designed and installed sprinkler system, causing the standpipe cap and coupling to separate and fail. It has thus failed to make out a prima facie case of negligence or breach of contract with respect to the 1996 renovations of the sprinkler system.

Hartford argues that it is entitled to judgment as a matter of law against American Sprinkler or, at least, an adverse inference as a sanction against American Sprinkler because it did not preserve the damaged parts from the standpipe despite Hartford's request.

We conclude that the district court did not abuse its discretion in declining to impose the drastic sanction of awarding judgment on the merits as a matter of law when it had concluded that Hartford failed to produce evidence probative of willful or bad-faith conduct on the part of American Sprinkler. Cf. Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998) (finding abuse of discretion in district court's dismissal of claim as sanction for spoliation of evidence where bad faith was not shown); Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995) (stating that an adverse inference about a

9

party's consciousness of the weakness of its case"requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction").

Moreover, the adverse inference requested by Hartford as an alternative sanction would not help it survive summary judgment on its claims regarding the 1996 renovations of the sprinkler system. Without evidence that draining and repressurization of a sprinkler system could cause the end cap and coupling of the standpipe in a properly designed and installed sprinkler system to separate, any adverse inference under the doctrine of spoliation would be irrelevant to Hartford's claims that American Sprinkler performed its 1996 renovations negligently or in breach of contract. Any adverse inference would, at most, create a presumption that the standpipe parts were defective -- a fact that would relate only to the 1982 installation of the sprinkler system, not the 1996 renovation. Since we have already ruled that Maryland's statute of repose shields American Sprinkler from claims based on the 1982 installation work, Hartford's requested inference could not advance its case.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

10