Filed: November 29, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 00-2523
(CA-97-4214-WMN)

Mark N. Silvestri,

Plaintiff - Appellant,

versus

General Motors Corporation,

Defendant - Appellee.

O R D E R

The court amends its opinion filed November 14, 2001, as follows:

On page 4, second full paragraph, line 12 -- "June 1988" is corrected to read "June 1998."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

MARK N. SILVESTRI,
Plaintiff-Appellant,

v.                                                              No. 00-2523

GENERAL MOTORS CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-97-4214-WMN)

Argued: September 27, 2001

Decided: November 14, 2001

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Widener joined. Judge Traxler wrote an opinion con-
curring in part and dissenting in part.

_____

COUNSEL

**ARGUED:** Marc Seldin Rosen, SHAR, ROSEN & WARSHAW,
L.L.C., Baltimore, Maryland, for Appellant. Harold Bruce Dorsey,
PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore,
Maryland, for Appellee. **ON BRIEF:** Proctor D. Robison, Ann Arbor,
Michigan, for Appellant. Jeffrey M. Yeatman, PIPER, MARBURY,
RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Mark Silvestri filed this products liability action against General Motors Corporation, alleging that the airbag in a 1995 Chevrolet Monte Carlo he was driving did not deploy as warranted when he crashed into a utility pole and that, as a result, his injuries from the accident were enhanced. Because Silvestri failed, before the vehicle was repaired, to give General Motors notice of his claim and an opportunity to inspect the vehicle -- which the district court concluded was "the sole piece of evidence in this case" -- the court dismissed Silvestri's action, finding dismissal to be the appropriate sanction for the spoliation of evidence in this case. For the reasons that follow, we affirm.

I

On November 5, 1994, Mark Silvestri was involved in a single vehicle crash in Preble, New York. Driving his landlady's Chevrolet automobile while intoxicated and at an excessive rate of speed, Silvestri lost control of the vehicle on a curve and slid off the road. The vehicle crashed through a split-rail fence and, as it was spinning, the front of the vehicle obliquely struck a utility pole. The vehicle rotated around the pole and continued past it, coming to rest in the front yard of a residence. During the accident, the airbag in the Chevrolet did not deploy. Although it appears that Silvestri was wearing his seatbelt, he sustained severe facial lacerations and bone fractures, permanently disfiguring his face. He contends that, had the airbag deployed, he would not have sustained these disfiguring injuries.

While Silvestri was in the hospital, his parents retained attorney William G. Moench to protect Silvestri's legal interests, both with respect to Silvestri's ticket for driving while intoxicated and his potential civil action against General Motors. When Moench later contacted Silvestri, Silvestri requested that Moench continue to represent him until his period of incapacitation ended and he was able to meet with Moench in person. Later, Silvestri discharged Moench, perhaps over a dispute with Moench about the advancement of litigation costs, which then had grown to $3000, and retained present counsel.

2

While acting on behalf of Silvestri, Moench retained two accident reconstructionists, Erik Carlsson and Albert Godfrey, to inspect the damaged Chevrolet and to visit the crash scene so that they could render expert opinions regarding the circumstances of the crash. Carlsson later testified that it was his understanding that he was conducting his investigation "in anticipation of filing a lawsuit against General Motors." Carlsson and Godfrey inspected and photographed the vehicle and inspected the site, and each prepared a report of his findings. Because Carlsson considered it important that General Motors have an opportunity to see the car, Carlsson "suggested" to Attorney Moench, at the time he conducted his inspection, that "the car has to be kept"; and Carlsson stated, "General Motors needs to see the car." He also told Moench after the inspection that "he does indeed have a case [against General Motors] because the airbag should have deployed."

At his inspection, which took place approximately a week after the accident, Carlsson examined the vehicle and took photographs. However, he took only one measurement of the vehicle and conducted no inspection of its undercarriage. While the one measurement he took was a "crush" measurement, he made no note of the measurement. At his deposition several years later, he "seem[ed] to recall" that the "crush" measurement was 18 inches, but he could not definitely remember the measurement. Similarly, Godfrey failed to make notes of any measurements that he may have taken during his inspection. He did, however, photograph a ruler on the hood of the vehicle to measure the extent to which the front of the hood was bent off center-line. When inspecting the site of the accident, Godfrey failed to measure the skid marks left by the vehicle, confessing that he formed his initial opinion about Silvestri's speed at the time of the accident by "eyeball[ing]" the skid marks.

After their inspections, both Carlsson and Godfrey prepared written reports, dated December 6, 1994, which they submitted to Moench. In his report, Carlsson concluded that the vehicle had been subjected to two impacts at the accident, a side impact and a frontal collision. The report stated, "It is evident that the damage was caused by the vehicle striking a wooden fence. A piece of wood is stuck in the passenger side door, and another piece in the rear tire." "The frontal impact was evidently, as depicted in the police report, with the utility

3

pole. . . . The damage indicates a collision with a narrow object, the initial point of impact being slightly to the right of the vehicle's center line." Carlsson explained further, "In spite of the substantial front end damage that affected the rails of the frame, the vehicle's airbag did not deploy at the accident. Yet, the diagnostics of the airbag showed no defect or malfunction." Carlsson concluded, "The failure by the airbag to deploy in this accident must be considered a defect that unnecessarily added to Mr. Silvestri's injuries."

In Godfrey's written report, Godfrey stated his opinion that the vehicle "struck the utility pole at an angle of approximately 25 Degrees and rotated through the window of 30 Degrees either side of the center line of the vehicle whereby the dual airbags in the vehicle should have inflated, however, failed to do so." He concluded, "A major question arises as to why the air bags did not inflate upon impact with the utility pole. Had the air bags worked properly the operator would not have struck his face on the steering wheel causing the massive facial injuries that were incurred."

Notwithstanding the anticipation of litigation against General Motors, neither Moench nor Silvestri took any steps to preserve the vehicle or to notify General Motors of the existence of the vehicle and Silvestri's potential claim. Indeed, General Motors was not notified about the accident until almost three years later when Silvestri commenced this action against the corporation. Yet, the vehicle remained in its damaged condition for more than three months after the accident. In early 1995, the title-owner of the vehicle, Carl E. Burhans, the husband of Silvestri's landlady, transferred title of the vehicle to his insurance company, and his insurance company in turn sold the vehicle to Prestige Collision, Inc., which repaired the vehicle and then sold it. General Motors ultimately found the vehicle in June 1998 in Quebec, Canada, in the possession of Real T. Durand. When, in 1998, General Motors inspected the airbag sensing and diagnostic module, which monitors and retains in its memory defects in the airbag system, it found that the module had not been damaged in the accident. The module revealed that there had been no defect in the airbag system. Silvestri's expert, however, questioned whether this was the original module that had been in the vehicle at the time of the accident.

4

After General Motors was named the defendant in this action, its reconstruction expert, Keith Schultz, evaluated the evidence collected by Carlsson and Godfrey, as well as the sensing and diagnostic module from the repaired vehicle. Based on the available evidence, Schultz concluded that the oblique impact of the vehicle with the utility pole did not meet the airbag deployment criteria set forth in General Motors' warranty to provide head and face protection in a frontal impact. He stated, "My investigation indicates that the impact speed and direction and conditions of the subject accident were not sufficient to cause the deployment of the SIR [Supplemental Inflatable Restraint] system and that the subject airbag properly did not deploy." He added, "It is my opinion that the injuries sustained by [Silvestri], due to the violent impact of wood from a fence impacting the vehicle compartment, could have been greater if the SIR had deployed as claimed by [Silvestri]." Schultz explained further that "the plaintiff was injured not by an impact with a telephone pole but rather when the vehicle ran through a wooden fence, violently projecting portions of the fence into the passenger compartment of the vehicle. The change in velocity, or the `delta V', of the vehicle when it impacted the telephone pole was not sufficient and not directionally correct to deploy the airbags." Schultz added a serious caveat to his opinions, however, indicating that Silvestri's failure to preserve the vehicle in its condition after the accident "hinders General Motors['] ability to defend plaintiff's claim of a product defect." He explained,

> Although the information stored in the SDM [Sensing and Diagnostic Module] indicates that the airbag system was operating properly at the time of the accident, a detailed inspection of the condition of the vehicle post-accident before any body repairs are performed is critical to performing a crush analysis of the vehicle. A crush analysis is performed by actually measuring the amount of crush at numerous points on the vehicle. These crush measurements are used to create a crush profile of the vehicle, which, in turn, is used to determine the change in velocity, or "delta V" of the vehicle in the accident. Such information is important to a detailed reconstruction of the accident.

He concluded that the destruction of this evidence had prejudiced General Motors' defense.

5

Following receipt of Schultz's report, both Carlsson and Godfrey changed some of their conclusions about their observations of the vehicle following the accident. For example, although Carlsson initially stated that the windshield on the vehicle had collapsed and fallen completely inward, making no reference to seeing any blood, he changed his report later to say that he saw blood on the windshield. Carlsson also originally concluded that Silvestri's face struck the windshield rather than the steering wheel and that he had not seen any deformation to the steering wheel nor any evidence that the steering column had been "stroked" (compressed) as a result of the accident. But in his later opinions, he concluded that Silvestri's face struck the steering wheel with a force sufficient to deform the steering wheel and cause the steering column to be stroked.

Godfrey likewise changed his opinions as well as his "original" observations. In his deposition, taken before Schultz's report became available, Godfrey stated that he did not take any crush measurements of the car and therefore did not calculate the equivalent barrier speed of the vehicle as it struck the utility pole. After Schultz's report, however, Godfrey gave a specific crush measurement of "approximately" 24 inches and a calculation of the equivalent barrier speed of 24 miles per hour, based on "a rule of thumb" of one mile per hour for each inch of crush. Not only had Godfrey previously indicated that he never took a crush measurement, Carlsson, who did take a crush measurement but did not make a note of it, "seemed to recall" that it was probably 18 inches. Under Godfrey's "rule of thumb," this would result in an 18 miles-per-hour barrier speed. In addition, Godfrey originally testified that he did not believe that anyone could calculate the angle at which Silvestri hit the steering wheel. But in a subsequent report, issued after Schultz's report, he stated that the front of Silvestri's skull and face hit the right side of the steering wheel.

Following discovery, General Motors filed a motion for summary judgment on various grounds, including the ground that Silvestri could not establish a prima facie case for a product defect. General Motors also asked that the case be dismissed based on Silvestri's spoliation of evidence. The district court concluded that Silvestri had not stated a prima facie case and therefore did not address the spoliation issue. On appeal, we concluded that under the law of New York, which the parties agreed governed this case, Silvestri had stated a

6

prima facie case. In response to General Motors' alternative request that we address the spoliation issue, we declined and remanded the case to the district court, stating that "the district court has broad discretion to address the matter, and in this case, the district court did not address spoliation in its ruling on General Motors' motion for summary judgment." Silvestri v. General Motors Corp., 210 F.3d 240, 245 (4th Cir. 2000).

On remand, the district court addressed General Motors' spoliation claim and dismissed the case on that basis. The district court concluded that Silvestri had breached his duty either to preserve the vehicle or to notify General Motors about its availability and his claim. The court concluded that Silvestri's failure to discharge this duty caused General Motors to be "highly prejudiced." After recognizing that the determination of whether the airbag should have deployed could only be determined by a reconstruction of the accident, the court explained that General Motors was denied the opportunity to reconstruct the accident accurately because of its inability to take the necessary crush measurements. As the court said:

> Therefore, Defendant is now forced to rely on the few measurements taken by Plaintiff's experts, Carlsson and Godfrey. As to these measurements, Carlsson admitted, during his deposition, that he only took one crush measurement -- that of what he believed to be the area of "maximum crush." . . . Not only was this lone measurement uncorroborated, but it was also inadequate. Defendant's expert opines, and plaintiff does not dispute, that crush measurements are generally taken at numerous points on the vehicle. . . . Based on the inability to take crush measurements alone, there is little doubt that defendant has been highly prejudiced.

In addition, the court noted that General Motors was prejudiced in its examination of the sensing and diagnostic module which monitored the airbag deployment system because Silvestri's expert challenged the results of the examination. As the court explained:

> In his second report, Carlsson cast doubt on whether or not the airbag system inspected in 1998, which indicated no system faults, was, in fact, the same system in the car at the

7

      time of the accident. . . . Defendant, at this late date, has no way of proving that the systems are the same. This is critical to Defendant's case as their defense rests, in large part, on the fact that, because the airbag system showed no faults, the conditions of the accident must not have met the threshold requirement to deploy the airbag.

The court added that not only was Silvestri put on notice that the evidence should have been preserved or General Motors notified, but he also "remained silent until almost three years later when his suit was filed."

From the district court's order of dismissal, Silvestri noticed this appeal.

II

On appeal, Silvestri contends that he is not responsible for any spoliation of evidence because (1) he had no duty to preserve the vehicle in question as he was not its owner, and (2) any act of spoliation was that of attorney Moench, hired by his parents, not him, and therefore was not imputable to him. He also argues that the sanction of dismissal was too harsh because General Motors was not so severely prejudiced that it could not adequately defend itself in the action.

In their briefs and at oral argument, the parties have agreed that the law of New York -- where the accident occurred-- supplies the applicable principles of spoliation, and they have cited that law to the court. We conclude, however, that a federal law of spoliation applies because, as we note below, the power to sanction for spoliation derives from the inherent power of the court, not substantive law. Nevertheless, we have recognized the articulation of spoliation principles from some of the New York cases cited to us.

A

Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. West v.

8

Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citing Black's Law Dictionary 1401 (6th ed. 1990)). The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct "which abuses the judicial process." Chambers v. Nasco, Inc., 501 U.S. 32, 45-46 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process); see also United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993) (recognizing "that when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action"); cf. Fed. R. Civ. P. 37(b)(2) (authorizing sanctions for violations of discovery orders).

The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth."[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions -- all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition." Shaffer Equipment, 11 F.3d at 457. The courts must protect the integrity of the judicial process because,"[a]s soon as the process falters . . . the people are then justified in abandoning support for the system." Id.

Thus, while the spoliation of evidence may give rise to court imposed sanctions deriving from this inherent power, the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses.

While a district court has broad discretion in choosing an appropriate sanction for spoliation, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." West, 167 F.3d at 779. In addition, a court must find some degree of fault to impose sanctions. We have recognized that when imposing spoliation sanctions, "the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanction-

9

ing the improper conduct." Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995). But dismissal should be avoided if a lesser sanction will perform the necessary function. West, 167 F.3d at 779.

We review the district court's exercise of its discretion for abuse. Hartford Ins. Co. v. Am. Automated Sprinkler Sys., Inc., 201 F.3d 538, 543-44 (4th Cir. 2000); West, 167 F.3d at 779.

B

Silvestri contends first that he had no duty to preserve the vehicle because he was not its owner and because neither he nor his agents were in any way engaged in the destruction of the evidence. This argument assumes too narrow an understanding of the duty at issue.

The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation. Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998). If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence. See Andersen v. Schwartz, 687 N.Y.S.2d 232, 234-35 (N.Y. Sup. Ct. 1999) (holding that in a products liability action arising from a vehicle collision where the vehicle was not owned by the plaintiffs, the plaintiffs nonetheless had an obligation to notify General Motors of the date and time of the initial and only inspection of the vehicle because the plaintiffs were aware that General Motors would be brought in as a defendant).

In this case, it is true that Silvestri did not own the vehicle, nor did he even control it in a legal sense after the accident because the vehicle belonged to his landlady's husband. But it is apparent that Silvestri had access to the vehicle, as his attorney Moench and his retained experts were given apparently unlimited access to the vehicle for inspection purposes. Moreover, the vehicle was preserved in its post-accident condition for perhaps two to three months, or more, a period during which Silvestri, his lawyer, and his experts recognized

10

not only that they would be suing General Motors but also that General Motors should be given an opportunity to inspect the vehicle. Within a couple of weeks of the accident, Silvestri's counsel had a conversation with his experts about the need to preserve the vehicle and have General Motors inspect it. One of Silvestri's expert witnesses, Erik Carlsson, testified that it was his understanding that his inspection of the vehicle was being conducted in anticipation of filing a lawsuit against General Motors and that he advised Moench that Silvestri had a valid case against General Motors "because the airbag should have deployed." In recognition of this, he stated to Moench, "therefore General Motors needs to see the car."

Indeed, Silvestri himself, Silvestri's parents, Moench, and the experts all recognized the need to act quickly to preserve evidence. The reason why Moench was retained and why he promptly retained reconstruction experts was to collect evidence before it was lost. The relevance of the evidence and the type of lawsuit to file became clear when Silvestri's experts conducted their inspection and concluded that the "failure by the airbag to deploy in this accident must be considered a defect that unnecessarily added to Mr. Silvestri's injuries." Even after these experts completed their inspection and their reports, the vehicle remained in its post-accident condition, yet no notice of any claim was given to General Motors nor was General Motors advised of any opportunity to inspect the vehicle. Moreover, there is no evidence to indicate that Silvestri attempted to buy the damaged vehicle or to request that it be maintained in its post-accident condition until General Motors could inspect it. It is readily apparent, therefore, that Silvestri, his attorneys, and his expert witnesses anticipated filing suit against General Motors and were fully aware that the vehicle was material evidence in that litigation. Yet, they failed to take any steps to ensure that Silvestri discharged his duty to prevent the spoliation of evidence.

Silvestri now argues, frivolously we conclude, that Moench was not his attorney and therefore that Moench's failure to preserve the evidence should not be imputed to Silvestri. The record belies any such contention. It is undisputed that following Silvestri's accident, he was incapacitated and his parents retained Moench to look after Silvestri's legal interests. Moreover, when Silvestri became aware of that fact, he explicitly ratified his parents' retention of Moench by

11

instructing Moench to continue representing him until he and Moench could get together to discuss the matter. Apparently, when they finally did meet, some two months after the accident, they found themselves in disagreement about who would advance the quickly increasing litigation costs, which at that point had reached several thousand dollars. Silvestri discharged Moench and retained new counsel, but he did not disavow the existence of an attorney-client relationship and the benefits of that relationship. In fact, Moench also represented Silvestri in connection with the related criminal matter involving Silvestri's driving while intoxicated, and Silvestri continued to use the investigative materials that Moench and the experts developed. Moreover, when Moench later sued Silvestri for attorneys fees and costs, Silvestri filed a counterclaim alleging attorney malpractice, a claim that could arise only out of an attorney-client relationship. As the district court correctly pointed out, to allow Silvestri to partake in the benefits provided by Moench -- the testimony and expert reports of Carlsson and Godfrey -- and at the same time disavow the acts of Moench in failing to preserve the evidence or notify General Motors would be "particularly unjust."

The district court concluded that even independent of Moench's conduct, the spoliation of evidence was imputable to Silvestri himself. First, Silvestri knew that Moench had retained experts to examine the vehicle, and he had authorized Moench to continue on his behalf to collect data in support of a potential lawsuit. Second, he knew the significance of preserving the automobile because when Moench sued him, he counterclaimed for malpractice, alleging that Moench had failed to preserve the vehicle which was to be evidence in this lawsuit. This all occurred long before General Motors was sued or had knowledge of the suit, and yet Silvestri took no steps to assure General Motors equal access to the evidence or to give General Motors notice of his claim.

In sum, we agree with the district court that Silvestri failed to preserve material evidence in anticipation of litigation or to notify General Motors of the availability of this evidence, thus breaching his duty not to spoliate evidence.

C

Silvestri contends that dismissal was an unduly harsh sanction for the spoliation that occurred in this case and that the district court

12

could have, instead, entered an order that designated facts be taken as established for purposes of the action or that presumptions be applied in connection with the burden of proof. In this vein, counsel for Silvestri made clear during oral argument that Silvestri was disavowing his experts' demand for proof that the sensing and diagnostic module that General Motors inspected in 1998 was the same one in the vehicle during the accident. Counsel stated during argument that Silvestri accepted the fact that the module that General Motors inspected in 1998 was the original one and that it revealed no system defect. Although counsel was attempting to mitigate the prejudice found by the district court by conceding this fact on appeal, the district court did not have the benefit of that concession. Even so, this issue was only one of the factors relied upon by the district court to find prejudice. Even without this factor, we still conclude that General Motors was severely prejudiced by the spoliation of evidence that occurred.

We agree with Silvestri that dismissal is severe and constitutes the ultimate sanction for spoliation. It is usually justified only in circumstances of bad faith or other "like action." Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998). But even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case. As the Supreme Court noted in Chambers, the district court has discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." 501 U.S. at 44-45. And it went on to point out that "outright dismissal of a lawsuit, which we had upheld in Link [v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)], is a particularly severe sanction, yet is within the court's discretion." Id. at 45.

As the New York courts have recognized, sometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness: "The expansion of sanctions for the inadvertent loss of evidence recognizes that such physical evidence often is the most eloquent impartial `witness' to what really occurred, and further recognizes the resulting unfairness inherent in allowing a party to destroy evidence and then to benefit from that conduct or omission." Kirkland v. New York City Housing Auth., 236 A.D.2d 170, 173 (N.Y. App. Div. 1997). In fashioning an appropriate sanction, the New York courts have focused not only on the conduct of the spoliator but also on the prejudice resulting from the destruc-

13

tion of the evidence. <u>See</u>, <u>e.g.</u>, <u>Squitieri v. New York</u>, 669 N.Y.S.2d 589, 590-91 (N.Y. App. Div. 1998) (finding dismissal appropriate where a party negligently disposed of the street sweeper at issue in the litigation, preventing the opposing party from countering the design defect claim with evidence of misuse, alteration, or poor maintenance of the sweeper); <u>Kirkland</u>, 236 A.D.2d at 173-74 (finding dismissal appropriate where a party unintentionally failed to preserve the crucial piece of evidence, a stove alleged to be defective, and, therefore, no actual inspection of the item at issue could be performed because "[i]ts loss `irrevocably stripped'[the defendant] of useful defenses").

At bottom, to justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

In the case before us, the conduct of the spoliator may have been either deliberate or negligent. We know that Silvestri's attorney knew that the vehicle was the central piece of evidence in his case against General Motors and that he had been reminded that this piece of evidence should be preserved or that General Motors should be notified. As it turned out, the vehicle was not preserved, and neither Silvestri nor his attorneys notified General Motors of Silvestri's claim until almost three years after the accident; by then, the evidence had been destroyed by the repair of the vehicle. Whether Silvestri's counsel believed he was securing advantage to his client's case by deliberately remaining silent for three years or whether he simply ignored his responsibilities through carelessness is not revealed in the record. But what is revealed is a level of culpability that was at least negligent and may have been deliberate. Accordingly, it is not clear whether Silvestri's conduct alone would justify dismissal.

When we turn to the prejudice suffered by General Motors, we agree with the district court's finding that the spoliation was "highly prejudicial." It denied General Motors access to the only evidence from which it could develop its defenses adequately. First, by not having access to the vehicle, General Motors could not develop a

14

"crush" model to prove that the airbag properly failed to deploy. In order to establish this model, General Motors needed crush measurements taken at several places on the automobile. These measurements would reveal not only the speed at impact, but also the direction of forces imposed on the car. This information would lead to an ability to determine whether the airbag device acted as designed and therefore was critical to the central issue in the case.

Silvestri's expert, Carlsson, testified that he took one crush measurement, but he did not write it down. At his deposition, however, he seemed to recollect the measurement to be around 18 inches. Godfrey made no such measurement. Yet, Godfrey later assumed a 24-inch crush measurement to conclude that the impact causing such a crush was a vehicle traveling at 24 miles per hour. Silvestri argues that General Motors could have used these same figures to determine its own crush model. But, as Silvestri acknowledges and General Motors has pointed out, General Motors needed more than one crush measurement to develop a crush model, and in this case the one crush measurement available was unreliable.

In addition, because of the spoliation, General Motors could not resolve the critical question of how Silvestri injured his head. General Motors asserts that Silvestri's injuries were actually caused by pieces of wood that entered the vehicle from the side when the vehicle struck the fence. It points out that if the accident was caused by the fencing, then the airbag would not have prevented Silvestri's injuries. Silvestri's experts, however, have contended, inconsistently, that Silvestri either hit the steering wheel or hit the windshield. In support of their contention they rely on changed recollections about the vehicle's condition. At one point, they argued that the steering wheel had not been deformed nor had its steering column been stroked. Yet, at another point, they say that it had been deformed and stroked. These inconsistencies could have been resolved by a thorough examination of the vehicle cabin to look for wood in the car, to determine the location of blood and hair, and to take measurements of the steering column.

Thus, not only was the evidence lost to General Motors, but the evidence that was preserved was incomplete and indefinite. To require General Motors to rely on the evidence collected by Silvestri's

15

experts in lieu of what it could have collected would result in irreparable prejudice. Short of dismissal, the district court would have been left to formulate an order that created facts as established or that created presumptions. But when Silvestri presents vehicle data as his only evidence of a product defect and that data is incomplete and perhaps inaccurate, the court would have no basis for determining what facts should be taken as established. On the other hand, if the court denied Silvestri's experts from testifying, as would be an alternative, then Silvestri would have no case at all.

In short, we conclude that the district court's finding that General Motors was "highly prejudiced" was not clearly erroneous and that in the peculiar circumstances of this case, the court's order dismissing this case, although severe, was not an abuse of discretion. Accordingly, the judgment of the district court is

AFFIRMED.

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Silvestri failed to discharge his duty to preserve the accident vehicle or at least notify General Motors that the vehicle was potential evidence. Therefore, I concur in sections I-IIB of Judge Niemeyer's opinion.

I believe, however, that the complete dismissal of the case was an excessive sanction. Keith S. Schultz, General Motors' expert witness and corporate designee, formed the opinion that "[t]he change in velocity, or the `delta V', of the vehicle when it impacted the telephone pole was not sufficient and not directionally correct to deploy the air bags" because "[t]he right front corner of the vehicle struck the telephone pole as it was sliding sideways off the roadway." J.A. 378. During his deposition, Schultz agreed that "General Motors does not need any information between what the vehicle looked like from these photographs immediately after the accident and the present time in order to support its position," J.A. 584, and that he had "sufficient information in order to form the opinions that [he had] expressed," J.A. 268.

16

In light of Schultz's ability to form an expert opinion, I am not convinced that General Motors suffered such prejudice that dismissal was the only solution. The district court did not conduct a hearing before dismissing the case, and there is nothing in the record indicating whether the court considered lesser sanctions. I would remand for the district court to consider imposing a sanction short of outright dismissal. Accordingly, I respectfully dissent only from section IIC of the majority opinion.

17