# CIRCUIT COURT OF THE CITY OF NORFOLK

Alexzandra E. Angelopoulos etc.

v.

Volvo Penta of the Americas, L.L.C., *et al.*

Case No. CL14-4909-01

By Judge Everett A. Martin, Jr.

December 21, 2015

I have reviewed the documents Mrs. Farley has submitted in response to Grady-White's subpoena *duces tecum*. As the City of Virginia Beach does not claim a privilege with respect to Case Nos. 2011-052660, 2012-040533, and 2012-040042, counsel may obtain redacted copies of those offense reports.

I sustain the City's Motion To Quash with respect to Case Nos. 2015-015665 and 2015-034603, and uphold its claim of a criminal investigative privilege. *In re Commonwealth of Virginia,* 41 Va. Cir. 571 (Va. 1978); *Decker v. Watson,* 54 Va. Cir. 493 (Prince William Co. 2001); *Harrington v. Roessler,* 89 Va. Cir. 366 (Fairfax Co. 2014). In the first case, the Supreme Court granted a writ of prohibition to stop a circuit court judge from doing what I have just done, *i.e.* review records of a pending case *in camera. Decker* was decided by Justice Millette while on the Circuit Court of Prince William County, and, as he observed, to overrule the motion to quash would give a civil litigant broader discovery than the plaintiff herself has as a criminal defendant in the pending cases. Rules 8:15(b); 3A:11(b)). The distinction Judge Bellows drew in *Harrington* is not present here.

January 11, 2016

This letter will address the last two issues before me: the motions regarding spoliation and the deposition of Mr. Wolcott.

## Spoliation of Evidence

As I recall from the hearing of December 14 (the "hearing," all dates in this letter are in 2015 unless otherwise indicated), the plaintiff claims a retaining screw was not in place in the shift actuator, and, as a result, the shift cable was not held in its slot, which caused a false reading on the engine control panel, *i.e.*, a reading that the engine was in neutral when it was actually in reverse. *See also* the Amended Complaint. All of the defendants save Richard Harris ("the manufacturing defendants") apparently claim that Harris's negligence in failing to shift the engine into neutral or turn it off caused the tow rope and the plaintiff's leg to be pulled into the propellers. (Grady-White's Answer to the Amended Complaint is not in either of this Court's files. Perhaps it was filed in federal court after removal.)

The accident occurred on June 30, 2011. A representative of Volvo Penta ("Volvo") learned of the accident through news reports and informed a representative of Grady-White on August 20, 2011.

Mr. Wolcott, with Harris's consent, conducted three inspections of the boat without giving notice to any representatives of the manufacturing defendants. In hindsight, this was imprudent. I agree Mr. Wolcott had an obligation to prepare a complaint well-grounded in fact, Code of Virginia § 8.01-271.1, but he has become a witness to events now in question and opened his conduct to criticism. Mr. Wolcott should have given the manufacturing defendants notice of the first inspection, as litigation was anticipated. *Silvestri v. GMC*, 271 F.3d 583, 591 (4th Cir. 2001). These defendants claim five items of evidence were lost or tampered with during those inspections or thereafter: (1) the diagnostic code, (2) the aft propeller and cone, (3) the screw, (4) the fragment of the tow rope, and (5) the shift cable. They request the dismissal of the case.

The first inspection occurred on April 3, 2012; the second inspection on July 26, 2012. They were not recorded on videotape. Mr. Wolcott wrote to representatives of the manufacturing defendants on July 31, 2012, and he disclosed that an investigation had been conducted by a boat mechanic and marine surveying company. He stated a possible cause of the accident was the absence of the shift cable retaining screw from its proper place.

The third inspection occurred on September 10, 2012, and it was recorded. Mr. Wolcott sent copies of the videotape to the manufacturing defendants on October 12, 2012. Mr. Wolcott received correspondence from counsel for the manufacturing defendants in November of 2012. On March 28, 2013, and November 14, 2014, inspections of the boat were conducted with representatives of the manufacturing defendants present.

Circuit courts in Virginia may impose sanctions for spoliation of evidence, including dismissal of the action. In deciding whether to do so the court should consider whether the respondent acted in bad faith and the movant was prejudiced. *Gentry v. Toyota Motor Corp.*, 252 Va. 30, 471 S.E.2d 485 (1996). Spoliation may occur by either intentional conduct or

negligence. *Wolfe v. Virginia. Birth-Related Neurological Injury Comp. Program,* 40 Va. App. 565, 581, 580 S.E.2d 467, 475 (2003). I do not believe Mr. Wolcott acted in bad faith, but there has been some prejudice.

## A. *The Diagnostic Code*

Mr. Wolcott, Harris, and Stuart Bailey, a mechanic Mr. Wolcott engaged, were the only people present at the first inspection. According to Bailey, they tried to start the engine but it would not start until the diagnostic code displayed was deleted. He deleted the code and started the engine. No one took a photograph of or wrote down the code that was displayed. He said there was only one code with numbers flashing in sequence. He knew Volvo had a diagnostic tool that would allow him to obtain a readout of data, but he made no effort to obtain it. Bailey, deposition of September 8, pp. 25-31. There is no way to know if only one code appeared.

In its supplemental motion, Grady-White refers to the testimony of Earl Joyner, a marine surveyor the plaintiff retained. They cite his testimony that it would be important to know what the diagnostic codes were, but omit his testimony that he knew "Very little. Nothing" about the engine's capability to store the codes. They cite his testimony that the codes would tell "the attitude of the engine at the time that the accident occurred," but omit what immediately follows: "Maybe it would tell you. It depends." Joyner, deposition of November 30, pp. 385-87.

Douglas Rose, a retired Volvo engineer, testified that had the diagnostic tool been used, it would have provided little more information than what is in the manual. It might also have provided production date, serial number, and hours of operation. Rose, deposition of December 2, pp. 139-42.

When asked at the hearing what was the most helpful information that could have been learned from the code, Mr. O'Sullivan said the number of hours on the engine. I do not believe the lack of that information prejudices Volvo, as everyone knows the boat was more than ten years old at the time of the accident. Mr. Chapman stated that the code would have told what gear the engine was in when it shut off. However, no expert report or deposition excerpt supports this claim, and, in any event, all counsel seem to agree the engine was in reverse when the plaintiff was injured. The principal issue for the manufacturing defendants appears to be what was then shown on the engine control panel.

One of Grady-White's experts, Robert Taylor, an experienced naval architect and mechanical engineer, stated "the intentional destruction of this information without any notice has deprived me of critical information that could have a direct bearing on understanding and determining the cause of the accident." Letter to Mr. Chapman of December 14, p. 9. He goes on to state: "Being deprived of the knowledge of which fault codes were present, I have been precluded from conclusively accounting for some material facts and evidence that would bear on causation of events." Letter

at p. 22. He does not state what those material facts are or what they could be, nor does he state how they might affect his opinions.

On page 2 of its second supplemental brief on this issue, Grady-White states that Geoffrey van Gorkom, a marine engineering expert, "admitted during his deposition that Bailey's actions constituted spoliation of critical evidence. . . ." He said no such thing. He said the information in the engine's diagnostic system "possibly, yes" would be helpful to establish the sequence of events. When directly asked if Bailey's conduct in clearing the codes was spoliation of evidence, he answered "Technically, maybe." He then admitted the obvious: that Bailey's actions deprived everyone of the opportunity to know what the codes were. Van Gorkom deposition of December 8, pp. 317, 323.

Grady-White's only specific evidence of possible prejudice comes from the deposition of Stephen Knox, an employee of Volvo. He testified (amidst a battery of defense objections) that had code 3.4 appeared, it would have indicated that "the shift cable was bound up" and would not move. Knox, deposition of December 21, pp. 123-28.

Grady-White's counsel at Knox's deposition, Mr. Stancliff, objected four times on three consecutive pages that the plaintiff had failed to lay a foundation that Knox was qualified "to testify as to the content meaning and implications of various engine diagnostic codes." Other defense counsel joined the first of these objections. Now, it seems, Grady-White believes this testimony to be helpful. However, having contended that it had not been shown that Knox was qualified to answer questions about the diagnostic codes, Grady-White may not now rely on Knox's answers.

I believe the diagnostic code may have provided useful information and that Bailey's deletion of it without recording it was negligent. However, the manufacturing defendants have failed to show how they were prejudiced by its deletion. Conclusory allegations do not suffice. They are free to raise this issue at the close of the evidence in the liability phase of the trial, as Judge Fulton will have had heard and seen all the evidence that could establish prejudice.

## B. *The Aft Propeller and Cone*

It appears the plaintiffs rescuers removed the aft propeller and cone to free her leg. Thus, necessity prevented the parties from examining how these parts appeared after the accident. It further appears that someone reattached them sometime later, but not too securely, because they fell off in the water during one of the plaintiff's three inspections. Bailey, deposition, pp. 50-52, 70-72; Brogan, letter of December 31.

Grady-White claims the loss of these components "has rendered it impossible . . . to inspect or test the entire boat, as it existed on the day of the accident, or to compare the physical characteristics of the non-standard propeller to the" plaintiff's injuries. Motion for Sanctions for Spoliation

of Evidence, pp. 3-4. What might such inspection or test have disclosed? Grady-White does not say. Taylor did not claim the loss of the propeller or the cone affected his ability to render an opinion. Is there any doubt the plaintiff was injured by a propeller?

Volvo claims the aft propeller and cone "likely would have revealed critical information regarding what occurred. . . ." The "critical evidence" includes, but is not limited to "the overall functioning of the injury causing aft propeller on the day of the accident and the condition of the aft propeller on the day of the accident." Motion for Dismissal, pp. 8, 16.

However, it now appears the aft propeller is and has for some time been on the boat. When it fell off, Harris jumped in the water and retrieved it; Taylor took photographs of it. Brogan, letter.

At the hearing on January 6, 2016, Mr. O'Sullivan said this propeller might be a Volvo product, which he said would be inconsistent with Harris's prior testimony. He has not, however, examined it. There is no evidence of prejudice.

## C. *The Screw(s)*

The contretemps about the screws could become a trial within the trial. According to Mr. Wolcott, Bailey found one screw in the boat's bilge on the first inspection (the "bilge screw"). A paralegal found a second screw on the boat's deck behind the captain's chair on the second inspection. Plaintiff's counsel call it the "deck screw;" defense counsel the "mystery screw." I shall call it the "second screw." The second screw instead of the bilge screw was produced during two depositions, and unpleasant accusations have been made and depositions of Mr. Wolcott and other employees of Wolcott Rivers Gates demanded.

Taylor stated at pages 11-13 of his letter that the bilge screw appears to be similar to one that would have been installed in the shifting mechanism, although that has not been verified, and that it could have ended up in the bilge had it fallen from its proper place.

Grady-White claims the bilge screw has been lost. Supplemental Brief, p. 4. By letter of December 8, Mr. Wolcott explained that human error, a common phenomenon, had occurred; that the wrong screw was mistakenly produced at the depositions; that he now possesses and has always possessed the bilge screw since the first inspection.

Grady-White attached two photographs of the bilge screw as Exhibits 6 and 7 to its supplemental brief. Exhibit 6 shows the screw next to a ruler calibrated at 1/100ths of an inch. Have the manufacturing defendants or their experts re-examined the screw Mr. Wolcott says is the bilge screw as he offered in his letter? No.

The manufacturing defendants have grounds for suspicion. Mr. Wolcott conducted three inspections without notice to them. His mechanic deleted a code during the first inspection. Plaintiff's counsel produced the wrong

screw at two depositions and, when questioned, initially insisted the second screw was the bilge screw. Plaintiff's counsel's disclosure of the second screw in discovery on December 8 was most tardy.

Nonetheless, I do not believe on the evidence before me that plaintiff's counsel have tampered with the bilge screw or "switched it out." To adapt an aphorism attributed to Napoleon Bonaparte: "Never ascribe to malice that which is adequately explained by [mistake]." I accept Mr. Wolcott's explanation, and I deny the motions as to the bilge screw.

Judge Fulton will have to decide whether the plaintiff has established an adequate foundation for the admission of the bilge screw at trial.

### D. *The Tow Rope Fragment*

Much of the rope was cut during the rescue of the plaintiff and not saved. Deposition of Brian Decker, October 16, pp. 62-65. The cutting of the rope was necessary to free the plaintiff's leg from the propeller. A fragment of the rope remained caught in the forward propeller as shown in Exhibit 34 at Harris's deposition and Exhibit 77 at Bailey's deposition. The defense claims the fragment has vanished. Ms. Waters has produced two photographs dated November 19, showing what appears to be a reddish-brown fiber between the forward propeller and the drive spindle. Is this the fragment? A piece of the fragment?

When asked at the hearing what the rope fragment could establish, Mr. O'Sullivan said it would indicate if Harris used the proper type of rope. He did not explain how the type of rope used could produce an improper reading on the engine control panel.

Taylor stated at page 9 of his letter that the rope lacked a harness and floats, but he did not complain of the loss of the fragment.

The manufacturing defendants have completely failed to persuade me that they are prejudiced by the lack of the rope fragment, if indeed it has vanished.

### E. *The Shift Cable*

Bailey claims he found the shift cable out of its proper slot when he opened the engine compartment during the first inspection. On several occasions during inspections he used his little finger to remove the cable from the slot and then replace it. (The manufacturing defendants also claim plaintiff's counsel sent them a videotape showing the cable jumping out of position, but they failed to disclose that Bailey was off-camera moving the cable with a finger. This is another ground for suspicion.) As I understand from the evidence thus far discovered, Bailey did not damage the cable or the actuator. No defense expert has so claimed, and defense experts have manipulated the cable during joint inspections. Bailey did, however, deprive the defendants of the opportunity to see the position of the cable after the

accident, and Grady-White complains of this. Motion for Sanctions for Spoliation of Evidence, p. 4.

Taylor wrote that, during shifting demonstrations on March 28, 2013, the shift cable never came out of its slot except when manually lifted. He further claims normal operations will not cause the cable to leave the slot, but that "significant sustained vertical accelerations" would be necessary and that such "vertical accelerations" would not be present when the boat was stopped to pick up passengers. Letter at pp. 14-17. Taylor also believes that the position of the shift cable out of the slot would have been caused by the accident, but was not the cause of the accident. Letter, at pp. 18, 21.

I find the manufacturing defendants have been prejudiced by Bailey's movement of the shift cable during the first inspection. Bailey deprived the manufacturing defendants of the opportunity to see its position after the accident. If the plaintiff offers evidence about the position of the shift cable at the first inspection, the manufacturing defendants will be entitled to a cautionary instruction.

### F. *Exposure to the Elements*

On pages 11-12 of its motion for dismissal, Volvo complains that the plaintiff did nothing to preserve or maintain the boat in the same condition it was in on the day of the accident and, as a result, Harris left the boat uncovered and exposed to the elements for nine months. Volvo does not state what this exposure may have done to prejudice it.

The short answer to this is: Harris owns the boat. The plaintiff and her counsel do not. The plaintiff and her counsel can have no duty to preserve property they do not own or control. *Austin v. Consolidation Coal Co.,* 256 Va. 78, 501 S.E.2d 161 (1998). In *Austin,* the Court held the owner of a hose had no duty to preserve it for the benefit of an employee who was contemplating a tort action against the distributor, which was an affiliate of the owner.

### *Motion To Compel the Deposition of Mr. Wolcott*

As previously noted, on November 20 and 30, during the depositions of witnesses, plaintiff's counsel produced the second screw instead of the bilge screw. On December 8, before the deposition of van Gorkom, Mr. O'Sullivan, without the notice in writing required by Rule 4:5, asked Mr. Wolcott to be deposed then and there about the screws. Transcript, Discussion of Screw, December 8, pp. 6-7. That was unprofessional. Mr. Wolcott refused. Mr. O'Sullivan then asked Mr. Wolcott: "Why are you afraid of having your deposition taken?" Tr. p. 9. That was unprofessional. Mr. O'Sullivan also stated that Mr. Carroll, co-counsel for the plaintiff, and the paralegal who found the second screw would need to be deposed. Tr., pp. 8, 21. No one has filed a motion to compel their depositions. Mr. Chapman

appears also to have been interested in having Mr. Wolcott deposed. Tr., pp. 13-16.

Mr. O'Sullivan asked Mr. Wolcott to produce the screws, and Mr. Wolcott twice offered to do so. Tr., pp. 11-12. He made a similar offer in his letter of December 8. Mr. O'Sullivan and Mr. Chapman have never accepted the offer.

On December 10, Grady-White sent broadly worded interrogatories and requests for production to plaintiff's counsel regarding physical evidence, photographs, and the chain of custody of evidence. On December 15, Grady-White filed a motion to compel a deposition of Mr. Wolcott to be taken on December 18 and to answer its discovery of December 10 by December 17.

A deposition of opposing counsel ought to be ordered only as a last recourse. The evidence the movant seeks must be crucial to the case and not privileged, and every reasonable alternative method of procuring that evidence must have been tried. *Ford Motor Co. v. National Indemnity Co.*, 2013 U.S. Dist. LEXIS 102985 (E.D. Va. 2013).

There are good reasons for these restrictions even when, as here, the attorney is a witness to events in question. It will often be claimed the attorney is a witness to important events during the course of an action such as this. Such a deposition could cause the disqualification of counsel, the denial to the client of his representation of choice, and a long delay in the resolution of the case. It will distract the attorney from the preparation of his client's case. The attorney may wish or need to obtain independent counsel. This can be costly. Claims of privilege are likely to be made at such a deposition, and, as a question to which a privilege is asserted could not be answered without waiving the privilege, the Court will have to rule on these claims. The overruling of a claim of privilege will necessitate a resumption of the deposition at a later time. The pattern can repeat itself. A deposition of opposing counsel can also be used to harass, and there are attorneys willing to exploit such an opportunity. Lastly, allowing depositions of opposing counsel in the absence of these restrictions will only feed the incivility that has taken root in our profession.

Even if I assume the bilge screw is crucial to the case and Mr. Wolcott's deposition could be conducted without claims of privilege being asserted, Grady-White has done nothing since December 8 to determine the authenticity of the screw Mr. Wolcott claims to be the bilge screw. The deposition of Mr. Wolcott is its first recourse. Neither counsel for the manufacturing defendants nor any of their experts have examined this screw nor compared it with photographs taken of the known bilge screw. Taylor testified in his deposition that he could likely identify the bilge screw from photographs and measurements he had taken. Taylor, deposition of December 30, p. 213.

With respect to the second basis for seeking to depose Mr. Wolcott, his presence at the first inspection, when the diagnostic code was deleted and the bilge screw was found, depositions of Bailey and Harris, the other persons present, have been taken. Grady-White has not even made a proffer of what it believes it might learn from Mr. Wolcott.

I deny the motion.