# STATE OF MICHIGAN

# COURT OF APPEALS

AMBER WOOD,

       Plaintiff-Appellee,

v

MICHAEL AARON COOK,

       Defendant/Cross-Defendant,

and

RHONDA ANNE COOK,

       Defendant,

and

HEAD UP L.L.C., doing business as PB'S
SPORTS GRILLE, doing business as SHARKS
REEF,

       Defendant/Cross-Plaintiff-
       Appellant.

UNPUBLISHED
January 9, 2018

No. 334901
Macomb Circuit Court
LC No. 2015-002461-NI

Before: STEPHENS, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In this dramshop action, defendant-appellant, Head Up L.L.C. d/b/a PB's Sports Grille d/b/a Sharks Reef ("defendant" or "the bar"), appeals by leave granted[1] an order which denied defendant's motion for summary disposition of plaintiff's claims, held that plaintiff was entitled to an adverse inference due to spoliation of evidence, and granted plaintiff leave to amend her pleadings. We reverse.

## I. BASIC FACTS AND PROCEDURAL HISTORY

---

[1] *Amber Wood v Michael Aaron Cook*, unpublished order of the Court of Appeals, entered December 21, 2016 (Docket No. 334901).

At approximately 1:46 a.m. on January 18, 2015, defendant Michael Cook ("Cook" or "AIP") drove a van owned by his mother, defendant Rhonda Cook, through defendant's wall. Plaintiff, who was outside on the patio smoking at the time, was injured when a large pole fell on her. Plaintiff alleged that Cook was angry over being ejected from, and refused re-entry into, the bar and that the anger caused him to intentionally drive the van into the bar. On July 16, 2015, plaintiff filed a complaint against Cook, Cook's mother, and the bar. The claims against Cook and his mother were for negligence and liability under the owner's liability statute, respectively. Plaintiff sued defendant for violation of the dramshop act, MCL 436.1707 *et seq*., and for ordinary negligence. Plaintiff's dramshop claim alleged that defendant knew or should have known that Cook was intoxicated and that plaintiff breached its duty not to serve alcohol to any person who was visibly intoxicated. Plaintiff's negligence claim against defendant alleged that defendant owed a duty to reasonably respond to situations on the premises which posed a risk of imminent and foreseeable harm to customers such as plaintiff and that defendant breached that duty by failing to call, notify, or otherwise reasonably expedite the involvement of the police when Cook was visibly intoxicated inside the bar and forcibly removed from the bar.

Multiple individuals testified by deposition. Nikki Twyman, the waitress who served Cook that night, testified that she noticed that Cook started to look intoxicated and should not be served any more alcohol. She told one of the bouncers to inform the manager that Cook looked visibly intoxicated. Twyman then removed the alcoholic drinks from Cook's table. Later, she saw Cook pick up a bottle of beer from another table. Bar manager Steven Giacoma testified that the usual procedure was for the waitress to tell a bouncer that the customer needed to be cut off and that the bouncer would inform a manager that the customer would no longer be served. Giacoma testified that he identified Cook as being visibly intoxicated and told the entire staff that Cook was cut off and should not be served any more alcohol. After Cook picked up the beer from the other table after being cut off, Giacoma told a bouncer to remove Cook from the premises. The bouncer took away the beer and escorted Cook out of the bar. Giacoma testified that he cut off alcohol for Cook at the first sign that Cook was visibly intoxicated. He did not observe Cook being loud or belligerent, but noticed that Cook was "a little wobbly" and concluded that he should not have any more alcohol to drink.

No one from the bar called the police when Cook was ejected or refused re-entry. They did, however, call the police after Cook drove the van into the bar. When police responded to the scene, an off-duty manager, Darcy Nieuwenbroek, told the officers that Cook's actions inside and outside the bar had been video-recorded by security cameras. Nieuwenbroek told police that she would save the video recording, but only bar owner Kelly Pendleton could download the video to a disc. The police asked Nieuwenbroek to have Pendleton provide a copy of the video recording to them. Pendleton ultimately saved the video from 1:36 a.m., shortly before Cook was first escorted out of the bar. Cook drove the van into the building and Nieuwenbroek called the police at 1:44 a.m. That saved portion of the video was copied and given to the police. According to later deposition testimony from Officer Neate, that was all the video the police requested from defendant. The digital video recording (DVR) system used by defendant's bar's security cameras saved video recordings for approximately 64 days before re-recording over the old videos. All other security video of Cook at defendant's bar on January 17 and 18, 2015 was apparently recorded over before plaintiff filed her dramshop and negligence actions against defendant.

Defendant moved for summary disposition of both plaintiff's dramshop and negligence actions pursuant to MCR 2.116(C)(8) and (10). Defendant argued that it was entitled to summary disposition of plaintiff's dramshop action because there was no evidence that defendant's employees served or provided alcohol to Cook while he was visibly intoxicated. With regard to plaintiff's negligence claim, defendant argued that the dramshop act was plaintiff's exclusive remedy for damages and that defendant's only duty as the premises owner was to reasonably expedite the involvement of the police, which defendant's employees did. Defendant argued that there was no evidence that Mr. Cook posed an imminent risk of harm to defendant's customers when he was removed from the premises or when he was refused re-entry. Once Cook's behavior became dangerous, defendant's employees immediately called the police.

Plaintiff argued that the security camera video recording would have shown that Cook displayed visible signs of intoxication during the time he was still being served alcohol by defendant's employees, and that she was entitled to an adverse inference jury instruction due to defendant's destruction of the video recording which would have shown Cook before 1:36 a.m. on January 18, 2015. Plaintiff moved to amend her complaint to add allegations that defendant's bouncers had physically and verbally confronted Cook when he attempted to re-enter the bar, thereby escalating Cook's anger and prompting him to drive the van into the building. Plaintiff alleged that defendant's employees' encounters with Cook demonstrated that Cook posed an imminent and foreseeable risk of harm which required them to call the police before he drove the van into the bar.

The court denied defendant's motions for summary disposition of plaintiff's dramshop claim, noting that Twyman conceded that it was possible she served alcohol to Cook while he was visibly intoxicated but just did not remember. Twyman also testified that surveillance camera video would have recorded her if she had served Cook while he was visibly intoxicated. The trial court found that plaintiff was entitled to an adverse inference that it would have shown defendant's employees serving a visibly intoxicated Cook.

With regard to plaintiff's negligence claim against defendant, the trial court noted that there is a "common-law duty to exercise due care in undertakings [which] is breached when an individual or entity creates a new dangerous and hazardous condition that injures a plaintiff." The trial court noted that despite Cook's visible level of intoxication, defendant's employees did not offer him water, coffee, or to call a cab. Instead, Giacoma directed his staff to remove Cook from the bar. The court noted that when Cook tried to re-enter the bar, defendant's bouncer Tony Whitmore "physically confronted Cook and gestured at him three times with his middle finger." Giacoma testified that the correct protocol when Cook tried to re-enter the bar was to call police instead of placing him in the parking lot where he could get into his car and drive drunk. The court wrote that "Plaintiff contends, and reasonable minds could conclude that this undertaking to remove Cook from the premises (engaging in self-help)" "was the catalyst for Cook's decision to drive into the building" and so "created a dangerous and hazardous condition that contributed to plaintiff's injuries." The court granted plaintiff's motion to amend the complaint to add allegations that defendant was negligent in its use of self-help remedies.

## II. ADVERSE INFERENCE

Defendant first argues that the trial court erred when it determined that plaintiff was entitled to an adverse inference instruction pursuant to M Civ JI 6.01 as a sanction for failing to produce the entire video of what happened at the bar that night. This Court reviews a trial court's decision to sanction a party for spoliation of evidence for an abuse of discretion. *Brenner v Kolk*, 226 Mich App 149, 160–161; 573 NW2d 65 (1997). An abuse of discretion occurs when the decision falls outside the range of reasonable and principled outcomes. *Barnett v Hidalgo*, 478 Mich 151, 158; 732 NW2d 472 (2007).

"Spoliation [of the evidence] refers to destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v Gen Motors Corp*, 271 F3d 583, 590 (4th Cir2011). A party has "a duty to preserve evidence" "[e]ven when an action has not been commenced and there is only a potential for litigation." *Brenner*, 226 Mich App at 162. This duty to preserve evidence includes all evidence "that [a party] knows or reasonably should know is relevant to the [anticipated] action." *Id.*

"[T]here are remedies available to a party claiming prejudice resulting from the loss or destruction of evidence." *Teel v Meredith*, 284 Mich App 660, 666; 774 NW2d 527 (2009). "A trial court has the authority, derived from its inherent powers, to sanction a party for failing to preserve evidence that it knows or should know is relevant before litigation has commenced." *MASB–SEG Prop/Cas Pool, Inc v Metalux*, 231 Mich App 393, 400; 586 NW2d 549 (1998). When it is alleged that a party failed to preserve evidence, the trial court has the discretion to fashion a sanction that deprives the party of the fruits of its misconduct. *Id.* The sanction may be the exclusion of evidence because of prejudice to the other party or an instruction to the jury that it may draw an adverse inference to the culpable party because of the absence of the evidence. *Id.* (Citation omitted.)

This issue involves an interplay between adverse presumptions and adverse inferences and plaintiff has not provided the Court with an explanation of how or why an adverse inference or presumption would apply in the context of a motion for summary disposition. It would seem that plaintiff believes she is entitled to a *presumption* that the missing footage would have been adverse to defendant. But there is a difference between presumptions and inferences:

> [T]he function of a presumption is solely to place the burden of producing evidence on the opposing party. It is a procedural device which allows a person relying on the presumption to avoid a directed verdict, and it permits that person a directed verdict if the opposing party fails to introduce evidence rebutting the presumption.

> Almost all presumptions are made up of permissible inferences. Thus, while the presumption may be overcome by evidence introduced, the inference itself remains and may provide evidence sufficient to persuade the trier of fact even though the rebutting evidence is introduced. But always it is the inference and not the presumption that must be weighed against the rebutting evidence. [*Widmayer v Leonard*, 422 Mich 280, 289; 373 NW2d 538 (1985).]

"Generally, where a party deliberately destroys evidence, or fails to produce it, courts *presume* that the evidence would operate against the party who destroyed it or failed to produce it." *Hamann v Ridge Tool Co*, 213 Mich App 252, 255; 539 NW2d 753 (1995) (emphasis added). In *Trupiano v Cully,* 349 Mich 568; 84 NW2 747 (1957) our Supreme Court explained:

> "It is a general rule that the intentional spoliation or destruction of evidence raises the presumption against the spoliator where the evidence was relevant to the case or where it was his duty to preserve it, since his conduct may properly be attributed to his supposed knowledge that the truth would operate against him." 20 Am Jur, Evidence, § 185, p. 191.

> The full section continues, however:

> "Such a presumption can be applied only where there was intentional conduct indicating fraud and a desire to destroy and thereby suppress the truth. Moreover, while the spoliation of evidence raises a presumption against the person guilty of such act, yet such presumption does not relieve the other party from introducing evidence tending affirmatively to prove his case, in so far as he has the burden of proof. The spoliation or suppression of evidence is a circumstance open to explanation." *[Trupiano*, 349 Mich at 571.]

A party may rebut a presumption by presenting a "nonfraudulent explanation for its decision to discard" the evidence. *Ward v Consolidated Rail Corp*, 472 Mich 77, 85; 693 NW2d 366 (2005). Once it does so, "the initial presumption dissolve[s], but the underlying inferences remain to be considered by the jury." *Id.*

Defendant has sufficiently rebutted any presumption by presenting evidence that the footage was destroyed as a matter of course and was not an attempt to suppress the truth. The record presented shows that defendant's employees and owner did not deliberately erase or record over the video recordings of the night of January 17 – 18, 2015. The record presented indicates that defendant's security DVR system re-recorded over its storage media after 64 days. Plaintiff did not file her complaint in this matter until July 16, 2015, approximately 3 months after the DVR system recorded over the video record which could have shown Cook at defendant's bar before 1:36 AM on January 18, 2015. There is no evidence that defendant's agents intentionally allowed the video media to be recorded over with the intent of destroying relevant evidence against defendant. Plaintiff relies heavily on Twyman's testimony that she watched the video *after* Pendleton told her about plaintiff's lawsuit, but Twyman's testimony was not at all clear about when she watched the video. Twyman later testified that she did not know when she watched the video or whether it was after the lawsuit had been filed.

The trial court noted that it was "troubled" by the assertion that there was confusion about whether the police "specifically requested" that the video be preserved. The trial court focused heavily on Neate's police report without referencing his deposition testimony, which supports defense counsel's position that there was certainly room for confusion regarding what footage needed to be preserved: "I don't recall giving her a specific time to start the video and end the video. I recall asking her to save the video of the incident . . .". Pendleton testified that she made the decision to preserve the video surveillance from that night; she did not

remember discussing the issue with Nieuwenbroek. Pendleton saved the video approximately a week later. She specifically selected the portions from 1:36 to 1:48. In an affidavit, Pendleton averred that she saved the portion of video showing Cook being escorted out and then crashing the van into the building. She did not save all of the video from that night because she did not know it was necessary to do so.

Defendant's failure to preserve the entire record of Cook's visit to the bar on the night of January 17 to 18, 2015 appears to be the result of a reasonable assumption that the accident itself was the only relevant footage rather than a deliberate act to keep damaging evidence from plaintiff. Because plaintiff presented no evidence of intentional fraudulent conduct or deliberate destruction of evidence, the court erred by finding that plaintiff was entitled to a presumption that the evidence would have been adverse to defendant and support a finding that defendant's employees served Cook while he was visibly intoxicated.

Nor was plaintiff entitled to an adverse *inference.* "A jury may draw an adverse *inference* against a party that has failed to produce evidence only when: (1) the evidence was under the party's control and could have been produced; (2) the party lacks a reasonable excuse for its failure to produce the evidence; and (3) the evidence is material, not merely cumulative, and not equally available to the other party." *Ward,* 472 Mich at 85–86; 693 NW2d 366 (emphasis added). The evidence was no longer under defendants' control and was not capable of being produced because it had been recorded over. Defendant's explanation for failing to produce the evidence was reasonable. Additionally, there was a question of whether the evidence was even material in light of the fact that witnesses involved were subject to deposition. Moreover, defendant was the moving party and the trial court was obligated to consider the pleadings, affidavits, depositions, admissions and other evidence in a light most favorable to plaintiff. Again, plaintiff has not provided this Court with an example of the application of an adverse inference or presumption in the context of a motion for summary disposition.

## III. PLAINTIFF'S DRAMSHOP CLAIM

Defendant next argues that the trial court erred when it denied defendant's motion for summary disposition of plaintiff's dramshop claim where there was no evidence that defendant served Cook after he showed signs of visible intoxication.

Summary disposition under MCR 2.116(C)(10) should be granted where the affidavits or other documentary evidence show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Bonner v City of Brighton*, 495 Mich 209, 220-221; 848 NW2d 380 (2014), cert den 105 S Ct 230 (2014); *Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996). To avoid summary disposition under MCR 2.116(C)(10) the party opposing the motion must show, via affidavit or documentary evidence, that a genuine issue of fact exists for trial. *Bonner*¸ 495 Mich at 221; MCR 2.116(G)(4).

MCL 436.1801 provides, in relevant part:

(2) . . .A retail licensee shall not directly or indirectly, individually or by a clerk, agent, or servant sell, furnish, or give alcoholic liquor to a person who is visibly intoxicated.

(3) Except as otherwise provided in this section, an individual who suffers damage or who is personally injured by a minor or visibly intoxicated person by reason of the unlawful selling, giving, or furnishing of alcoholic liquor to the minor or visibly intoxicated person, if the unlawful sale is proven to be a proximate cause of the damage, injury, or death, or the spouse, child, parent, or guardian of that individual, shall have a right of action in his or her name against the person who by selling, giving, or furnishing the alcoholic liquor has caused or contributed to the intoxication of the person or who has caused or contributed to the damage, injury, or death. In an action pursuant to this section, the plaintiff shall have the right to recover actual damages in a sum of not less than $50.00 in each case in which the court or jury determines that intoxication was a proximate cause of the damage, injury, or death.

To prevail on a claim under the dramshop act, a plaintiff must prove (1) an injury by an intoxicated person's wrongful or tortious conduct; (2) that the person's intoxication was the sole or contributing cause of the injuries; and (3) that the defendant sold, gave or furnished to the visibly intoxicated person the alcoholic beverage that caused or contributed to his or her intoxication. *Walling v Allstate Ins Co*, 183 Mich App 731, 738-739; 455 NW2d 736 (1990), lv den 437 Mich 977 (1991); *McKnight v Carter*, 144 Mich App 623, 629; 376 NW2d 170 (1985), lv den 424 Mich 859 (1985); see also M Civ JI 75.12. "The mere fact that the alleged intoxicated tortfeasor drank alcoholic beverages is not sufficient to establish that he was visibly intoxicated." *McKnight*, 144 Mich App 629. In short, intoxication may not be inferred simply by the fact that liquor was consumed. *Id*. Instead, "to establish 'visible intoxication' under MCL 436.1801(3), a plaintiff must present evidence of actual visible intoxication." *Reed v Breton*, 475 Mich 531, 534, 542; 718 NW2d 770 (2006). In *Reed* our Supreme Court explained:

> While circumstantial evidence may suffice to establish this element, it must be actual evidence of the *visible* intoxication of the allegedly intoxicated person. Other circumstantial evidence, such as blood alcohol levels, time spent drinking, or the condition of other drinkers, cannot, as a predicate for expert testimony, alone demonstrate that a person was *visibly* intoxicated because it does not show what behavior, if any, the person *actually manifested* to a reasonable observer. These other indicia—amount consumed, blood alcohol content, and so forth—can, if otherwise admissible, reinforce the finding of visible intoxication, but they cannot substitute for showing visible intoxication in the first instance. [*Id*. at 542-543 (footnotes omitted, emphasis in original)].

Plaintiff presented no evidence that Cook was visibly intoxicated at the time he was provided alcohol by defendant's employees. Plaintiff relies almost entirely on the "destroyed" footage that *may* have supported her contention that defendant served Cook when he was visibly intoxicated. Plaintiff also points to the fact that Twyman could not *confirm* that she did not serve Cook when he was visibly intoxicated. After reviewing Twyman's entire deposition, it is clear that any "confusion" in her testimony was the result of zealous and somewhat suggestive questioning. Plaintiff's attorney tried to paint Twyman as an un-trained waitress who failed to keep track of her patrons' alcohol consumption. In fact, Twyman testified that she received three days of training before serving drinks to customers. She was told not to serve alcohol to people who were intoxicated. In the two years she worked for defendant, she had been instructed by

managers to stop serving patrons who were visibly intoxicated. She had also independently refused to serve customers who were showing signs of visible intoxication, including "getting rowdy, loud, um, doing things sober people don't do, like throwing napkins all over the ground." At no time did Twyman observe Cook vomit, knock anything over, slur his speech, or have difficulty walking or standing. When Cook began to show signs of visible intoxication, Twyman alerted one of the bouncers. Twyman removed the alcohol from Cook's table and kept an eye on him after that. She asked a bouncer to remove Cook when she caught Cook taking a bottle of beer from someone else's table.

Plaintiff also points to Giacoma's deposition testimony that Cook demonstrated outward signs of intoxication because he was a "little wobbly, slurred speech, lots of talking, you know, he's jumping around talking to this person, talking to that person" and "it's not hard to visually see that he was intoxicated." Aside from that, Cook showed no signs of being physically sick, argumentative, or problematic. But once again this testimony falls far short of raising an issue of material fact as to whether Cook was served *after* he showed signs of visible intoxication. Giacoma confirmed that protocol required Twyman to alert a bouncer when she suspected a patron was intoxicated. That information was then conveyed to all the other workers, including the manager, who retained ultimate authority to order an individual to stop being served. As soon at Giacoma was alerted about Cook's state, he ordered Twyman to cut him off. Cook was cut off at the first sign that he was visibly intoxicated. Giacoma was willing to give Cook the benefit of the doubt and not have him immediately removed. Instead, as protocol required, all alcohol was removed from Cook's table. Cook was not served alcohol after he was cut off, but managed to swipe a beer from another table, which caused him to be ejected.

The evidence shows that when defendant's employees noticed Cook's unsteady appearance suggesting intoxication, they stopped serving him alcohol and did not allow him to possess alcoholic drinks on the premises. While plaintiff relies heavily on the negative inference instruction, such an inference cannot create a genuine issue of material fact in the absence of other evidence. "Presumptions cannot be weighed against other credible evidence, for they have no value as evidence unless no other credible evidence whatsoever is introduced in regard to the presumed fact. As a rule they disappear if and when credible evidence is introduced from which the facts may be found." *Krisher v Duff*, 331 Mich 699, 705; 50 NW2d 332 (1951). Over a dozen witnesses were deposed and none of them testified to the fact that Cook was served alcohol after he showed signs of visible intoxication. Defendant was entitled to summary disposition of the dramshop claim under MCR 2.116(C)(10).

## IV. PLAINTIFF'S NEGLIGENCE CLAIM

Defendant argues that the trial court erred in failing to grant defendant summary disposition on plaintiff's ordinary negligence claim because such a claim was barred by the exclusive remedy provision of the dramshop act, MCL 436.1801(10).

"The general rule at common law was that a tavern owner was not liable for furnishing alcoholic beverages to a customer who became intoxicated and who, as a result of his own intoxication, either injured himself or an innocent third person." *Jackson v PKM Corp*, 430 Mich 262, 266; 422 NW2d 657 (1988). The dramshop act was created to "fill the void left by the common law's general rule of nonliability" and was intended to be "a complete and self-

contained solution to a problem not adequately addressed at common law and the exclusive remedy for any action arising under 'dramshop related facts.' " *Id.* at 267, quoting *Millross v Plum Hollow Golf Club*, 429 Mich 178, 186; 413 NW2d 17 (1987). As such, the dramshop act "provides the exclusive remedy for money damages against a licensee arising out of the selling, giving, or furnishing of alcoholic liquor to a minor or intoxicated person." MCL 436.1801(10). Still, "the dramshop act neither abrogates nor controls the common-law action." *Jackson*, 430 Mich at 276-277. Therefore, a claim is not precluded "if it arises out of conduct other than selling, giving away, or furnishing of intoxicants." *Id.*

Under *Jackson*, there is a two-part inquiry in determining whether a claim is proscribed by the exclusive remedy provision of the dramshop act:

> (1) Does the claim against "the tavern owner" arise out of an unlawful sale, giving away, or furnishing of intoxicants? If so, the dramshop act is the exclusive remedy.

> (2) If the claim arises out of conduct other than selling, giving away, or furnishing of intoxicants, does the common law recognize a cause of action for the negligent conduct? If so, then the dramshop act neither abrogates nor controls the common-law action. If not, there is no independent common-law claim. [*Jackson*, 430 Mich at 276-277, quoting *Manuel v Weitzman*, 386 Mich 157, 163; 191 NW2d 474 (1971).]

In *Madejski v Kotmar Ltd*, 246 Mich App 441, 446–447; 633 NW2d 429 (2001), this Court explained:

> a claim is not precluded under the dramshop act merely because it *involves* the unlawful furnishing of alcohol. In determining whether a plaintiff has stated a valid independent cause of action under the common law, a court must examine whether the situation is one in which there is a recognized duty at common law, that is, whether the actor was under any obligation to exercise reasonable care under the circumstances. The distinction is that the *duty* breached, but not necessarily the claim's factual basis, must arise from something other than the unlawful furnishing of alcohol. [*Id.* (quotation marks and citations omitted).]

If a plaintiff sets forth a proper claim based on a duty under common law, summary disposition is "improper even though the factual basis of the claim involves the unlawful furnishing of alcohol." *Id.* at 447.

Here, plaintiff sued defendant for violation of the dramshop act and for ordinary negligence. Plaintiff's dramshop action alleged that defendant knew or should have known that Cook was intoxicated and that plaintiff breached its duty not to serve alcohol to any person who was visibly intoxicated. Plaintiff's negligence claim against defendant alleged that defendant owed a duty to reasonably respond to situations on the premises which posed a risk of imminent and foreseeable harm to customers such as plaintiff and that defendant breached that duty by failing to call, notify, or otherwise reasonably expedite the involvement of the police when Cook was visibly intoxicated inside the bar and forcibly removed from the bar.

Plaintiff contends that this case is no different than a general premises liability action and that the dramshop act should not act as a bar to her claims because defendant had a duty to plaintiff separate and apart from its liability under the dramshop act. However, plaintiff's complaint alleges that her injuries were the direct result of Cook's intoxication. Her common law claim was contingent and necessarily related to establishing that defendant negligently served Cook alcohol. Therefore, despite plaintiff's attempts to frame the facts of the case into a general premises liability action and out of the realm of the dramshop act, the substantive facts of the case clearly involve an injury arising "out of the selling, giving, or furnishing of alcoholic liquor" "against a licensee." MCL 436.1801(10). Therefore, MCL 436.1801(10) preempts plaintiff's claims.

Even if plaintiff's ordinary negligence claim was not precluded by the exclusive remedy provision of the dramshop act, defendant was nevertheless entitled to summary disposition of plaintiff's claim. Plaintiff contends that defendant breached its duty to reasonably respond to the situation. She argues that defendant should have involved police sooner. In effect, plaintiff alleges that defendant had a duty to protect her from Cook.

In *Mason v Royal Dequindre, Inc*, 455 Mich 391, 405; 566 NW2d 199 (1997), our Supreme Court held that "merchants have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." However, this duty is limited. "[A] merchant can assume that patrons will obey the criminal law," and the risk of criminal actions by third parties are considered unforeseeable, unreasonable risks of harm. *MacDonald v PKT Inc*, 464 Mich 322, 335-336, 338; 628 NW2d 33 (2001). Therefore, a merchant has "no obligation to otherwise anticipate the criminal acts of third parties." *Id*., at 338. Only if a merchant has notice that a third party's criminal acts pose a risk of imminent and foreseeable harm to an identifiable invitee, does the merchant have a duty to make reasonable efforts to contact the police. *Id*., at 335-336, 338. In *Bailey v Schaaf*, 494 Mich 595; 835 NW2d 413 (2013) (*Bailey II*), our Supreme Court explained that, while there is a heightened duty on merchants based on the element of control, a merchant may still presume that invitees will obey the law:

> In *Mason v Royal Dequindre, Inc*, this Court clarified that merchants have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties. However, beyond indicating that a merchant's actions must be reasonable, the Court did not articulate the scope of the merchant's duty.

> We finally did so in *MacDonald*, holding that the duty to respond is limited to reasonably expediting the involvement of the police and that there is no duty to otherwise anticipate and prevent the criminal acts of third parties. As in *Williams* [*v Cunningham Drug Stores, Inc*, 429 Mich 495, 500–501, 418 NW2d 381 (1988)], we explained that, because criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. As a result, it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties. Although the element of control is essential in establishing a landlord or

-10-

merchant's duty over the premises, they do not have effective control over situations involving spontaneous and sudden incidents of criminal activity. On the contrary, control is precisely what has been lost in such a situation. [*Bailey II*, 494 Mich at 613 (footnotes and quotation marks omitted).]

Thus, a merchant has a duty to respond by reasonably expediting police involvement where it is given notice of a "specific situation occur[ring] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee." *Id*. at 615.

Defendant had no duty to predict and prevent Cook's unforeseeable criminal behavior. Defendant owed plaintiff nothing more than a duty to reasonably expedite police involvement. Plaintiff seems to imply that defendant had a duty to call the police as soon as Cook was ejected. However, despite the fact that Cook appeared to be visibly intoxicated, there was no evidence that he posed a risk of imminent and foreseeable harm to the patrons inside defendant's bar, let alone a risk of harm to a specific, identifiable customer like plaintiff. The record does not indicate that Cook was assaultive, belligerent, or even particularly loud at the time defendant's employees cut off his alcohol. Nor was he removed from the bar for assaultive or threatening behavior. He was removed after he attempted to take a beer off another table after he was cut off. While this was contrary to the bar's rules, it was not something which would suggest that Cook was likely to assault others. While Cook attempted to return to the bar after being removed, and apparently quarreled with the bouncer outside when refused admission, there was still no evidence suggesting that he was likely to assault anyone inside the bar, let alone drive a van into the building. Since plaintiff presented no evidence that Cook posed a risk of imminent and foreseeable harm to any of defendant's customers, there was no reason for defendant's employees to call the police at the point they stopped serving Cook alcohol, ejected him from the bar, and refused to re-admit him into the bar. Once Cook actually committed the dangerous criminal act, defendant's employees promptly called the police. The court should have granted defendant summary disposition of plaintiff's negligence claim under MCR 2.116(C)(10).

## V. PLAINTIFF'S MOTION TO AMEND

Finally, defendant argues that the trial court erred when it permitted plaintiff to amend her complaint to add yet another claim of negligence.

A trial court's decision on a motion to amend a complaint is reviewed for an abuse of discretion. *Trowell v Providence Hosp & Med Ctrs, Inc,* 316 Mich App 680, 690; 893 NW2d 112 (2016).

Plaintiff argues that, having undertaken to physically remove Cook from the bar, defendant owed plaintiff a duty to perform the task with due care. Instead of proceeding with care and caution, plaintiff claims that defendant used unnecessary physical force and inappropriate gestures, exacerbating and escalating Cook's behavior. This allegation is slightly different from plaintiff's claim that defendant failed to timely involve police. She sought to amend her complaint to include this new claim. Citing *Fultz v Union-Commerce Ass'n*, 470 Mich 460, 463; 683 NW2d 587 (2004) and *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 169; 809 NW2d 553 (2011), plaintiff argued that "[a] question of fact exists regarding whether Defendant's use of self-help, its bouncers, increased the risk of harm in this

situation. If a merchant voluntarily undertakes to prevent the criminal activity of a third party and thereby enhances the risk of harm to invitees, it can be liable for the resulting harm." The trial court agreed that under *Loweke* "reasonable minds could conclude that this undertaking to remove Cook from the premises (engaging in self-help)" "was the catalyst for Cook's decision to drive into the building" and so "created a dangerous and hazardous condition that contributed to plaintiff's injuries."

Both plaintiff and the trial court misapprehend *Fultz* and *Loweke,* which address the duty owed to third-parties in the context of executing a contractual obligation. Neither case addressed a situation like the one at bar where plaintiff seeks to impose a duty on defendant to protect and prevent against the criminal acts of a third party. In any event, for the reasons previously stated, plaintiff's exclusive remedy was the dramshop act and she failed to raise a genuine issue of material fact that defendant breached its limited duty to involve the police. Even if *Fultz* applies, there is no evidence that defendant created a new hazard. As previously discussed, the "hazard" that plaintiff complains of is Cook's visible intoxication. Under MCR 2.118(A)(2), leave to amend pleadings should be freely given unless such an amendment would be futile. *Miller v Chapman Contracting*, 477 Mich 102, 105; 730 NW2d 462 (2007). The trial court abused its discretion when it permitted plaintiff to amend her complaint.

Reversed. As the prevailing party, defendant may tax costs. MCR 7.219.

/s/ Cynthia Diane Stephens
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-12-