Ford v. Jurgens, 2022 NCBC 9.

STATE OF NORTH CAROLINA

WAKE COUNTY

JOHN FORD and CHRISTOPHER
KISGEN, derivatively on behalf of
TRIANGLE REAL ESTATE
INVESTORS ASSOCIATION, INC.,

Plaintiffs,

v.

CARL ARNOLD JURGENS, JR.;
KATHIE RUSSELL; TRIANGLE REAL
ESTATE INVESTORS ASSOCIATION
(TREIA), LLC; and TREIA
FOUNDATION, INC.,

Defendants,

v.

TRIANGLE REAL ESTATE
INVESTORS ASSOCIATION, INC.,

Nominal Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 4896

**ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR
SANCTIONS**

## I.    INTRODUCTION

1.    THIS MATTER is before the Court on Plaintiffs John Ford and Christopher Kisgen's (together, "Plaintiffs") Motion for Sanctions (the "Motion"), (ECF No. 89), filed pursuant to Rule 11 of the North Carolina Rules of Civil Procedure (the "Rule(s)"), the inherent powers of the Court, and Rule 8.4 of the North Carolina Rules of Professional Conduct.  The Motion alleges startling misconduct on the part of a litigant, Defendant Kathie Russell ("Russell") who is also a licensed attorney and member of the North Carolina State Bar.  Plaintiffs contend that Russell created and

produced in discovery false documents that she fabricated to support her position in this case.

2.      Falsification of evidence is an intolerable and insidious offense that is difficult to uncover.  Consequently, when falsification does come to light, the law demands that its perpetrator receive a severe sanction.  Anything short of such a response would undermine the integrity of the justice system, a system that first depends on parties telling the truth.

## II.      PROCEDURAL BACKGROUND

3.      Plaintiffs filed this Motion on 22 June 2021.  (ECF No. 89.)  On 22 October 2021, in support of the Motion and after full briefing, Plaintiffs requested leave to file the affidavit of their forensic expert, Clark Walton ("Walton"), the affidavit of Clint Morse, and a supplemental brief.  (ECF Nos. 115–18.)  On 12 November 2021, Plaintiffs requested further leave to file the Triangle Real Estate Investor's Association, Inc.'s ("TREIA, Inc." or the "Association") revised responses to requests for admission, and the deposition transcript of Frank Gray, formerly counsel to the Association.  (ECF No. 125.)

4.      Following a hearing on the Motion on 18 November 2021, (ECF No. 119), the Court granted Plaintiffs' two motions for leave to supplement the record.  The Court also permitted Defendants the opportunity to conduct a deposition of Walton with respect to the expert affidavit submitted by Plaintiffs and allowed both parties to submit additional briefing specific to Walton's testimony.  (ECF No. 130.)

5. Having considered the parties' written submissions, argument at the hearing, and the relevant record, the Court finds the facts and makes the conclusions below.

### III. FINDINGS OF FACT

6. The Court finds the following facts based on the evidence presented.

7. The underlying derivative action was filed on 9 April 2020 by Plaintiffs, who were members of the Association's Board of Directors at the time. (Verified Compl., ECF No. 3.)

8. The Association is a nonprofit real estate investment association formed in 2003 to provide educational and networking benefits to its membership. (First Am. Verified Compl. ¶¶ 1, 13 [hereinafter "Compl."], ECF No. 11.)

9. On behalf of the Association, Plaintiffs complain that two other Association board members, Russell and Carl Arnold Jurgens, Jr. ("Jurgens"), improperly redirected control of the Association's assets, including its membership, to two newly-formed entities: Triangle Real Estate Investors Association, LLC, a for-profit entity (the "LLC"), and TREIA Foundation, Inc., a nonprofit corporation established for charitable purposes (collectively, the "New Entities"). *See Ford v. Jurgens*, 2021 NCBC LEXIS 89, at *2 (N.C. Super. Ct. Oct. 5, 2021) (providing further detail as to the background of this case); (Compl. ¶¶ 2–3.)

10. Plaintiffs claim, among other things, that Russell and Jurgens wrongly transferred cash and other assets from the Association to the New Entities in violation of the Association's articles of incorporation and bylaws, and that they

improperly induced the Association's membership to switch allegiance to the New Entities. *Ford*, 2021 NCBC LEXIS 89, at *3; (Compl. ¶¶ 3, 22–30, 57–60.)

11. Plaintiffs' Motion asserts two allegations for the imposition of sanctions: (i) that Russell fabricated portions of the Association's bylaws to support her position in this litigation, and (ii) that Russell created false emails and then back-dated them to use as evidence in this case.

A. The Association's Bylaws

12. At all relevant times in this litigation, Russell is and has been an attorney licensed to practice in North Carolina and a member of the State Bar. (Aff. Kathie L. Russell ¶ 1 [hereinafter "Russell Aff."], ECF No. 9.)

13. Prior to the institution of this action, Plaintiffs, through counsel, communicated to Russell their position that the transfer of assets from the nonprofit Association to the for-profit LLC violated the law. (*See* Compl. ¶¶ 57–60; Pls.' Br. Supp. Mot. Sanctions Ex. 5, ECF No. 90.5.) Russell responded that the transfer was legal and in compliance with the Association's bylaws. She shared a copy of the purported bylaws in PDF format via email to support her position. The copy she provided is referenced by the parties and herein as "Scan 03-06". (*See* Pls.' Br. Supp. Mot. Sanctions Exs. 5 & 5.A, ECF Nos. 90.5–.6.)

14. Plaintiffs' counsel compared the Association's original bylaws from 2003, (Pls.' Br. Supp. Mot. Sanctions Ex. 2, ECF No. 90.2), with a copy of the bylaws he had received from another board member on 16 March 2020, (Pls.' Br. Supp. Mot. Sanctions Ex. 4, ECF No. 90.4), and found the two copies to be consistent with one

another. However, neither version contained the language that Russell claimed to be in the bylaws. Instead, Scan 03-06, which was provided by Russell on 16 March 2020, was significantly different, and it alone contained the terms that supported Russell's position. (*See* Aff. Clint S. Morse, ECF No. 109.1; Pls.' Br. Supp. Mot. Sanctions Ex. 5.A.)

15. Specifically, among other differences, Article XI, Section 5 of Scan 03-06 allowed the bylaws to be amended without notice to the Board of Directors and stated, "In the event of a conflict between the Bylaws and the Articles of Incorporation, the Bylaws shall govern." (Pls.' Br. Supp. Mot. Sanctions Ex. 5.A, at Art. XI § 5.) Article XIII, Section 2 of Scan 03-06 contained more permissive language for the Association to "confer benefits upon its members" and to pay its members, directors or officers "for services rendered or other value received[.]" (Pls.' Br. Supp. Mot. Sanctions Ex. 5.A, at Art. XIII § 2.) Section 3 of the same Article changed the language regarding the distribution of assets upon dissolution of the Association from "shall be used or distributed exclusively for one or more exempt purposes within the meaning of Section 501(c) of the Internal Revenue Code" to "shall be distributed pursuant to N.C.G.S. § 55A-14-03 with preference for distribution to organizations which would benefit the Members[.]" (Pls.' Br. Supp. Mot. Sanctions Exs. 2 & 5.A, at Art. XIII § 3.)

16. The bylaws provided by Russell also contained numerous formatting inconsistencies when compared to the other versions. (*See* Expert Report Clark C.

Walton, Esq. [hereinafter "Walton Report"] Ex. Q., ECF No. 139.52 (describing the formatting consistencies); Pls.' Br. Supp. Mot. Sanctions 7, ECF No. 90 (same).)

17.     Plaintiffs therefore contend that the bylaws Russell sent prior to the litigation (Scan 03-06) were not authentic but, in fact, were manipulated in relevant places by Russell to corroborate her statements regarding the transfer of the non-profit Association's assets to the for-profit LLC.  (*See* Pls.' Br. Supp. Mot. Sanctions 5–7.)

18.     On 1 March 2021, after the litigation had commenced, Defendants produced in discovery yet another version of bylaws (the "1 March 2021 bylaws") that largely tracked the language of Scan 03-06.  (Pls.' Br. Supp. Mot. Sanctions Ex. 6, ECF No. 90.8.)

19.     Russell filed the "Scan 03-06" bylaws with the Court as an attachment to an affidavit in which she testified that this version was "a true and correct copy of the current Bylaws" and that she was "aware of no version of the Bylaws of TREIA, Inc. other than th[is] version[.]"  Russell denies that she changed the bylaws to comport with her position in this case.  (Russell Aff. ¶ 31, ECF No. 9; Russell Aff. Ex. E, ECF No. 9.6.)

20.     Plaintiffs' counsel hired Walton as their forensic examiner to review Scan 03-06.  (Aff. Clark C. Walton, Esq. ¶ 5 [hereinafter "Walton Aff."], ECF No. 117.) Clark Walton is Managing Director and the principal forensics and cyber security expert for Reliance Forensics, LLC.  He has an undergraduate degree in

Mathematical Sciences from the University of North Carolina and a law degree from Georgetown University. (Walton Report Ex. A, ECF No. 139.52.)

21. From 2000 through 2005, Walton worked for the Central Intelligence Agency as a cyber threat analyst and technical project manager. He has taught computer forensics to United States military special operations assets, federal law enforcement personnel, judges, law students, and college students. Over the course of his career Walton has conducted or overseen forensic examinations in more than one thousand (1,000) matters. (Walton Report Ex. A.)

22. Walton has been recognized by the North Carolina Court of Appeals as an expert in computer forensics. *See Crosmun v. Trs. of Fayetteville Tech. Cmty. Coll.*, 266 N.C. App. 424, 429 (2019).

23. Relying on Walton's conclusions, Plaintiffs argue that both Scan 03-06, which was presented to the Court, as well as the 1 March 2021 bylaws later produced by Defendants in discovery, were altered by Russell. (Walton Aff. ¶¶ 23–26; *see* Walton Aff. Exs. J–K, ECF Nos. 117.18–.19.) However, Walton's conclusions themselves do not go that far.

24. Specifically, Walton concluded that Scan 03-06 was a PDF document that had been created from a Word document. The "author" identified in Scan 03-06's metadata was someone named "Susan,"[1] and "the PDF was both created and last modified on March 6, 2020 at 1:30:04 PM." (Walton Aff. ¶¶ 25–26.)

---

[1] Plaintiffs contend, unchallenged, that "Susan" is one of Russell's employees. (Pls.' Reply Br. Supp. Mot. Sanctions 7 n.2, ECF No. 109.)

25. Walton testified generally that metadata can be altered when a PDF is saved as a new file, (Dep. Clark C. Walton, Esq. 58:9–59:13; 68:11–12 [hereinafter "Walton Dep."], ECF No. 143.1), and "wacky formatting" can occur through the optical character recognition process used when either a document is scanned into a Word-formatted file or a Word-formatted file is saved as a PDF, (Walton Dep. 80:3–83:11).

26. Walton could not determine with certainty on which computer Scan 03-06 was created, (Walton Report ¶ 44), and although the metadata showed the PDF document was created from a Word document by someone named "Susan," he could not discern whether "Susan," Russell, or someone else made changes to the document while it was in Word format. Walton was also not able to locate the document from which Scan 03-06 originated. (Walton Report ¶ 44; Walton Dep. 95:10–22.)

27. Walton did not review the 1 March 2021 bylaws that Defendants produced during discovery, but the substantive changes in Scan 03-06 continued to be present in the 1 March 2021 version Russell produced. (*See generally* Walton Aff.; *compare* Pls.' Br. Supp. Mot. Sanctions Ex. 5.A, *with* Pls.' Br. Supp. Mot. Sanctions Ex. 6.)

28. Walton ultimately opines to a reasonable degree of forensic certainty that "[Scan 03-06] was created on March 6, 2020 from Microsoft Word 2016 (not a scanner)." (Walton Report ¶ 31.) He does not offer an opinion regarding when and who made the substantive changes to the bylaws, nor can he say whether the changes were authorized.

29. Russell denies making substantive changes to the bylaws, (*see* Russell Aff. ¶ 31), but admits that Plaintiffs' expert has established that Scan 03-06 "was created from a Microsoft Word 2016 file and . . . the pdf file was created and last modified on March 6, 2020[,]" (Def. Kathie Russell's Suppl. Br. Opp'n Pls.' Mot. Sanctions 1–2, ECF No. 143; *see* Walton Dep. 71:7–9).

30. The Association has neither confirmed nor denied the authenticity of Scan 03-06 as its bylaws. It says only that Russell has denied any wrongdoing and that it does not know what happened. (*See* Def. TREIA, Inc.'s Resp. Opp'n Pls.' Mot. Sanctions 2, ECF No. 105 ("[T]he non-party Board members do not have knowledge or information as to the explanation for differences . . . between . . . [S]can 03-06 and the [1 March 2021] Bylaws[.]"); *see also* Defs. Jurgens & Russell's Resp. Pls.' Mot. Sanctions 10, ECF No. 108 ("Defendant Russell has steadfastly denied that she fabricated the TREIA[,] [Inc.] bylaws in any way . . . . Defendants are still investigating the issues and are under no obligation to respond to or acknowledge Plaintiffs' unproven 'theories.' ").)

31. Because the evidence does not establish when the changes were made, by whom, or with what authority before their conversion to Scan 03-06, reasonable alternative explanations exist as to why the language of Scan 03-06 varies from that of other versions of the Association's bylaws.

B. The Laramie E-Mails

32. Sometime in Spring 2019, Defendants Russell and Jurgens announced to the new LLC's membership that it would be conducting a "TREIA Pilot Real Estate

Rehab Participatory Class" (the "Pilot Program") as an educational opportunity for Association members who were interested in buying and selling houses for profit. (Jurgens & Russell's Mot. Strike, Answer Verified First Am. Compl., Defenses & Countercls. & Second Mot. Temp. Restraining Ord. & Prelim. Inj. & Expedited Br. Schedule ¶ 47 [hereinafter "Countercls."], ECF No. 14.)

33. Meanwhile, A.C. Johnson ("Johnson"), president of Russell's client NuCapital Associates, Inc. ("NuCapital"), informed Russell that his cousin owned a house located on Laramie Court in Cary, North Carolina, that was subject to two mortgages and a tax lien and was in need of repair. (Russell Aff. ¶ 42.) Johnson proposed that he and Russell purchase the house as an investment. (Russell Aff. ¶¶ 42–43.) They agreed to form the entity AK Partners Real Estate ("AK Partners") to purchase the property. (Russell Aff. ¶ 44.)

34. In July 2019, Russell decided that the Laramie Court house would be a project better suited for the Pilot Program than for AK Partners. (Russell Aff. ¶ 45.) Russell presented the possibility to the participants in the Pilot Program, telling them that one of her clients, NuCapital, would "wholesale" the property to them. (Russell Aff. ¶ 46.)

35. The Pilot Program participants agreed to purchase the property subject to its tax lien and contributed an additional $69,718.00 out-of-pocket to buy it. (Russell Aff. ¶ 47.) Russell testified that the Pilot Program's participants were fully informed as to "the details of the propert[y], the existing mortgages, the IRS lien, the

fact that NuCapital would be wholesaling the property, and specifically that NuCapital was [her] client." (Russell Aff. ¶ 46.)

36.   Russell did not disclose a personal financial interest in the property when speaking with the Pilot Program participants. (Russell Aff. ¶¶ 42–51; *see* Compl. ¶¶ 31–33.)

37.   Ultimately, AK Partners purchased the property from the seller subject to its tax lien for $28,676.55. AK Partners then sold the property, still subject to its tax lien, to the Pilot Program participants for $ 69,718.00. (Russell Aff. ¶¶ 49–50.)

38.   Russell states that the entire profit on the transaction was paid to NuCapital and claims that she received only the legal fees paid to her law firm. (Russell Aff. ¶ 50; Countercls. ¶¶ 60–61.)

39.   In support of the Motion, Plaintiffs point to eight drafts of an email exchange between Russell and Johnson in various stages of development (the "Laramie Emails"). They contend that the email exchange was fabricated and that Russell created and forwarded her final draft of the fabricated email exchange to defense counsel to produce in discovery in order to support her denial of self-dealing.[2] (*See* Pls.' Suppl. Br. Supp. Mot. Sanctions 4–8, ECF No. 116.)

40.   The Laramie Emails are drafts that, once completed, reflect a fake email exchange in which Russell purported to "give up [her] half" of AK Partners, the partnership she had with Johnson, so that he, alone, could then sell the Laramie

---

[2] Plaintiffs also contend that, upon review of Russell's computer, Walton uncovered more emails relating to the Pilot Program that had been manipulated prior to being produced in discovery. (*See* Pls.' Suppl. Br. Supp. Mot. Sanctions 6 & Ex. 48, ECF No. 139.47.)

property to the participants in the Pilot Program, thereby avoiding any conflict of interest. Russell attempted to change history saying, "I know we made the offer in the name of AK Partners but I can just sign my half of the partnership over to you and I will step out of it. If you are willing . . . . I would stay out of it to avoid conflicts." Russell then drafted Johnson's response, "Call me. I'm willing." (Pls.' Reply Br. Supp. Mot. Sanctions Ex. 6, ECF No. 109.3; *see also* Walton Aff. Exs A–H1, ECF Nos. 117.1–.16)

41.    Walton examined the Laramie Emails and made the following findings regarding the final draft ultimately produced in discovery "[b]eyond a reasonable degree of forensic certainty[,]" (Walton Report ¶ 7):

       a. On 28 December 2020, Russell created a previously non-existent email conversation between herself and Johnson discussing the Laramie Court property for the Pilot Project.

       b. Defendant Russell backdated the newly-created emails so that it would appear that they were sent on 10 July 2019, well before this litigation began.

       c. Russell then forwarded the newly-created emails to her counsel to be produced in discovery. (Walton Report ¶¶ 7, 11–21; Walton Aff. ¶ 22.)

42.    Through counsel, on 26 February 2021 and again on 15 March 2021, Russell produced the newly-created emails bate-stamped RUSSELL – JURGENS000720 through RUSSELL – JURGENS000721 in response to Plaintiffs'

discovery requests. (Suppl. Aff. Clint. S. Morse ¶ 6 [hereinafter "Suppl. Morse Aff."], ECF No. 118; *see* Walton Aff. Ex. I, ECF No. 117.17.)

43. There is no indication in the record that Russell's lawyers knew the Laramie Emails were fabricated when they were produced in discovery pursuant to Rule 26(g). (*See* Suppl. Morse Aff. ¶ 6; Walton Aff. Ex. I.)

44. Despite requests from Plaintiffs' counsel, Russell did not produce a native copy of the Laramie Emails, and Johnson did not produce the Laramie Emails in response to a subpoena. (Pls.' Reply Br. Supp. Mot. Sanctions Ex. 3, at 2–3, ECF No. 109.3).

45. Nowhere in the record does Russell deny the allegation that she created these fake emails. (*See generally* Defs. Carl Arnold Jurgens, Jr. & Kathie Russell's Resp. Opp'n Pls.' Mot. Leave File Add. Material & Br. Supp. Pls.' Mot. Sanctions, ECF No. 122; Def. Kathie Russell's Suppl. Br. Opp'n Pls.' Mot. Sanctions.)

46. The Court finds that Russell created, and then back-dated, the fake Laramie Emails to counter allegations of self-dealing in the Amended Complaint.

47. After Russell forwarded the fabricated Laramie Emails to defense counsel, they were produced to Plaintiffs during discovery in this litigation.[3] (Suppl. Morse Aff. ¶ 6; Walton Aff. Ex. I.)

---

[3] The record does not contain the signed discovery response referenced by Plaintiffs, but Defendants do not contest that they included the Laramie Emails, bate-stamped RUSSELL-JURGENS 000720 *et seq*. with their responses to Plaintiffs' discovery requests. (*See, e.g.*, Defs. Carl Arnold Jurgens, Jr. & Kathie Russell's Resp. Opp'n Pls.' Mot. Leave File Add. Material & Br. Supp. Pls.' Mot. Sanctions 8 (admitting that the documents were "produced in the extensive ESI discovery Plaintiffs demanded in this action.").) Therefore, as discussed *infra*, the Court concludes that the discovery responses referencing the falsified Laramie Emails violate Rule 26(g).

48.     The Court finds that Russell engaged in this misconduct alone and that neither her counsel nor any of the other Defendants were aware that Russell falsified the Laramie E-mails when those documents were produced in discovery.

49.     Plaintiffs, the Association, the New Entities, and Jurgens have incurred costs as a direct result of Russell's falsification of the Laramie Emails. These costs include those associated with Plaintiffs' Motion, the parties' related briefs and supplementary materials, the expense of the Plaintiffs' expert to perform services and testify, and the hearing on this Motion.

## IV. CONCLUSIONS OF LAW

50.     Trial courts have the inherent authority to sanction parties when faced with misconduct in the litigation process. *See Daniels v. Montgomery Mut. Ins. Co.,* 320 N.C. 669, 674 (1987) ("Through its inherent power the court has authority to do all things that are reasonably necessary for the proper administration of justice." (citation omitted)); *Red Valve, Inc. v. Titan Valve, Inc.,* 2019 NCBC LEXIS 57, at *39 (N.C. Super. Ct. Sept. 3, 2019) ("[T]he power to sanction disobedient parties, even to the point of dismissing their actions or striking their defenses, . . . is longstanding and inherent." (quoting *Minor v. Minor*, 62 N.C. App. 750, 752 (1983) (alterations in original))); *see Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991) (stating that neither statutes nor court rules "displace[] the inherent power to impose sanctions for . . . bad-faith conduct" because they "are not substitutes for . . . inherent power").

51.     Separately, the North Carolina Rules of Civil Procedure require this Court to impose sanctions against a party whose counsel, acting at the direction of

his client, certifies a discovery response that the party has "interposed for any improper purpose[.]"[4] N.C. R. Civ. P. 26(g); *see Azalea Garden Bd. & Care, Inc. v. Vanhoy*, 2009 NCBC LEXIS 7, at \*15 (N.C. Super. Ct. Mar. 26, 2009) (explaining that Rule 26(g) is designed to "make discovery a more cooperative and less adversarial system[,]" "to reduce, not increase, the cost of litigation[,]" and therefore "mandates sanctions when violations of the rule occur"); *Turner v. Duke Univ.*, 325 N.C. 152, 164 (1989) ("Violation of Rule 26(g) subjects the attorney or party to mandatory sanctions.")

52.     "When imposing sanctions, 'the trial court has discretion to pursue a wide range of actions both for the purpose of leveling the evidentiary playing field and for sanctioning the improper conduct. ' " *Clark v. Alan Vester Auto Grp., Inc.*, 2009 NCBC LEXIS 13, at \*27 (N.C. Super. Ct. July 17, 2009) (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)). The Court is free "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th Cir. 2001)); *see Red Valve, Inc.*, 2019 NCBC LEXIS 57, at \*41 ("The imposition of sanctions is left to the sound discretion of the trial judge and 'will not be overturned absent a showing of abuse of discretion.' " (quoting *Cloer v. Smith*, 132 N.C. App. 569, 573 (1999))); *Turner v. Duke Univ.*, 101 N.C. App. 276, 280–81 (1991) ("[T]he selection of sanctions remains

---

[4] Plaintiffs argue that sanctions are appropriate under Rule 11. (*See* Pls.' Br. Supp. Mot. Sanctions.) Because the Laramie Emails were produced in discovery, the Court decides this Motion under the analogous provisions of Rule 26(g). *See* G. Gray Wilson, North Carolina Civil Procedure, Ch. 26, § 26-15 (Matthew Bender) (citing *Brooks v. Giesey*, 334 N.C. 303, 318 (1993) ("[Rule 26], as opposed to Rule 11, is the proper avenue for sanctioning misconduct involving discovery responses.").

within the discretion of the trial court, and Rule[ ] . . . 26 specifically authorize[s] imposition of appropriate sanctions not only against the person who commits the improper act, but also against the person on whose behalf the improper act was committed.")

53.     The party seeking sanctions bears the burden of proof by the greater weight of the evidence. *See Adams v. Bank United of Tex. FSB*, 167 N.C. App. 395, 401 (2004) (stating that under Rule 11, "the burden of proof is by the greater weight of the evidence." (citation omitted)); *Brooks,* 334 N.C. at 318 ("[S]anctions under Rule 26(g) may be applied following Rule 11 case law[.]"); *Turner,* 325 N.C. at 163–64 (interpreting Rules 11 and 26(g) to be analogous). However, the moving party does not have to demonstrate that it suffered prejudice. *See Stocum v. Oakley*, 185 N.C. App. 56, 64 (2007) (noting that Rule 11 sanctions do not require a finding of prejudice).

54.     The Court first concludes that Clark Walton is an expert in the field of computer forensics.

55.     With respect to the Association's bylaws, alternative explanations exist with respect to the differences that Plaintiffs believe to be suspect in the version produced by Defendants at Russell's direction. Walton was unable to opine regarding when and where the particular changes to the bylaws originated, and there is no evidence regarding whether those changes were approved by the Association. For her part, Russell denies manipulating the language and has testified that she is not aware of any version of the bylaws other than the version she ultimately produced.

The Association was unable to identify its own bylaws. Therefore, the Court concludes that the evidence is insufficient at this stage for Plaintiffs to meet their burden to prove that Russell fabricated portions of the Association's bylaws and produced a falsified document to Plaintiffs during discovery and to the Court with her affidavit.

56. On the other hand, the Court concludes that Plaintiffs have satisfied their burden with respect to the Laramie Emails that were created by Russell on 28 December 2020 and backdated to 10 July 2019. Walton opined to a reasonable degree of certainty that Russell both created and backdated the emails. It is undisputed that she forwarded the false emails to her counsel to produce with discovery responses, and that counsel, relying on her representation that the emails were authentic, produced them in discovery.[5] The Court concludes that Russell's egregious and intolerable litigation misconduct and violation of the certification required by Rule 26(g) warrants sanctions against her.

57. But there is no evidence in the record that either Russell's counsel or any other defendant was aware of the misconduct. Therefore, Plaintiffs have failed to carry their burden of proving that sanctions are appropriate with respect to counsel or any other defendant. *Cf. Swisher Hygiene Franchise Corp. v. Clawson*, 2019 U.S. Dist. LEXIS 149512, at *19 (D. Ariz. Sept. 3, 2019) (sanctioning corporate entities as

---

[5] Similarly, Walton concludes, as does this Court, that, separately from the Laramie Emails (the eight drafts referenced above), Russell also fabricated a second chain of emails regarding the Laramie project that she backdated to June 26–27. (*See* Walton Report ¶ 26 ("[T]he subsequent June 26 and June 27 correspondence depicted in the email is completely fabricated and was typed out freehand by Russell on the night of December 28, 2020.").)

well as individual wrongdoer when the latter was acting in the course of his duties for the company's benefit).

58. The Court next turns to a determination of the appropriate sanctions. Plaintiffs request, among other things, that this Court strike Russell's answer and enter judgment against her. (Br. Supp. Mot. Sanctions 13.) To be sure, terminating sanctions have been found to be appropriate in cases like this one. *See, e.g.*, *Garcia v. Berkshire Life Ins. Co.*, 2007 U.S. Dist. LEXIS 103953, at *21–22 (D. Colo. Nov. 29, 2007) ("Without doubt, fabricating evidence and willfully providing false answers during discovery are abusive litigation practices which justify the sanction of dismissal with prejudice."); *Asia Pac. Agric. & Forestry Co. v. Sester Farms*, 2013 U.S. Dist. LEXIS 125988, at *27 (D. Or. July 1, 2013) ("To permit the fabrication of spurious corroborating evidence without the imposition of a harsh responsive sanction would constitute an open invitation to abuse of the judicial system of the most egregious kind.").

59. Moreover, this Court has inherent authority to strike Russell's answer and default her in this action. *See Garcia*, 2007 U.S. Dist. LEXIS 103953, at *21 ("Courts have inherent equitable powers to dismiss actions as a sanction for abusive litigation practices." (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980); *TeleVideoSystems, Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987))); *Lunsford v. JBL Communs., LLC*, 2021 NCBC LEXIS 17, at *15 (N.C. Super. Ct. Mar. 3, 2021) ("[E]ven the most severe sanctions, including terminating sanctions, are appropriate so long as that sanction is among those expressly authorized by statute

and there is no specific evidence of injustice." (citation and internal quotation marks omitted)).

60.    However, "striking a party's answer is a severe sanction which should only be imposed where the trial court has considered less severe sanctions and found them to be inappropriate." *Red Valve, Inc.*, 2019 NCBC LEXIS 57, at *62–63 (citations and internal quotation marks omitted); *see Lunsford*, 2021 NCBC LEXIS 17, at *15 ("It is essential to consider 'less severe sanctions' before choosing dismissal or entry of judgment." (citing *Feeassco, LLC v. Steel Network, Inc.*, 264 N.C. App. 327, 337 (2019))); *but see Swisher Hygiene Franchise Corp.*, 2019 U.S. Dist. LEXIS 149512, at *20–25 (concluding that a sanction for the entity was appropriate when its executive committed the offending action).

61.    Furthermore, the "[i]mposition of sanctions that are directed to the outcome of the case, such as dismissals, default judgments, or preclusion orders, . . . are examined in the light of the general purpose of the Rules to encourage trial on the merits." *Moore v. Mills*, 190 N.C. App. 178, 180–81 (2008) (quoting *Am. Imps., Inc. v. G. E. Emps. W. Region Fed. Credit Union*, 37 N.C. App. 121, 124 (1978)); *see also Swisher Hygiene Franchise Corp.*, 2019 U.S. Dist. LEXIS 149512, at *10 ("Due process limits the imposition of the severe sanctions of dismissal or default to extreme circumstances in which the deception relates to the matters in controversy and prevents their imposition merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." (citation and internal quotation marks omitted)).

62. While a severe sanction is appropriate, the Court determines that striking Russell's answer is too blunt a force to use. The allegations regarding Russell are intertwined with the allegations against other defendants who appear to be innocent of her misdeeds. Therefore, to default her would be to punish them as well. The Court determines that a sanction impacting Russell alone is more appropriate under the unique circumstances of this case. *See Garcia*, 2007 U.S. Dist. LEXIS 103953, at *19 (awarding sanctions where "[t]he great significance of [the fabricated evidence] is that it demonstrates that the [party's] willingness to lie knows no bounds" and stating that such conduct "is destructive of the justice system and is intolerable").

63. Additionally, a default would harm more than it would cure. The falsified documents pertain only to Plaintiffs' First Claim for Relief based on a one-time project involving the Laramie Court property. The gravamen of this action is whether Russell and Jurgens duped the Association into transferring its assets—and lured its membership—to the New Entities. A determination of those claims does not turn on the Laramie Emails. *Cf. Swisher Hygiene Franchise Corp.*, 2019 U.S. Dist. LEXIS 149512, at *20 (determining that default was appropriate because the falsification went to the heart of the case).

64. That said, Russell's fabrication of the Laramie Emails unnecessarily complicated and extended this litigation resulting in significant expense to the other parties. The Court concludes that these costs would not have been incurred but for Russell's actions. Therefore, the Court, in its discretion, awards to Plaintiffs, the

Association, the New Entities, and Jurgens the costs associated with Plaintiffs' Motion, the parties' related briefs and supplementary materials, the expense of the Plaintiffs' expert to perform services and testify, and the hearing on this Motion. These costs are to be paid personally by Russell.

65. In levying this sanction, the Court specifically finds that, in falsifying the Laramie Emails, Russell acted to further her own personal interests and failed to act in good faith or with reasonable grounds to believe that her actions were in the best interests of the Association or the New Entities.

66. Additionally, the Court, in its discretion, concludes that an evidentiary sanction is appropriate. Regardless of, and without forecasting, any determination regarding either: (a) the viability of Plaintiffs' First Claim for Relief for breach of fiduciary duty based on Russell's actions with respect to the Laramie project, (*see* Compl. ¶¶ 76–92), or (b) the substantive evidentiary value of the Laramie Emails, if this action is tried, the Court will allow evidence of Russell's misconduct with respect to the Laramie Emails, including but not limited to the testimony of Walton, to be admitted for impeachment purposes, *see Garcia v. Berkshire Life Ins. Co.*, 2007 U.S. Dist. LEXIS 94420, at *20 (D. Colo. Dec. 27, 2007) (stating that regardless of whether the fabrication implicates matters material to the claims, "credibility is always relevant and material in any case"); *Esposito v. Suffolk Cnty. Cmty. Coll.*, 517 F. Supp. 3d 126, 136 (E.D.N.Y. 2021) (Courts have "inherent powers, not conferred by rule or statute . . . to fashion an appropriate sanction for conduct which abuses the judicial process." (citation omitted) (alteration in original)).

67.    Finally, the Court is constrained to observe that, in this case, Russell is a litigant.  Had she appeared as a practicing attorney, this Court would be compelled to sanction her further for the base violation of professional responsibility that has occurred.  It understates the severity of the offense to say that this type of conduct is inconsistent with the integrity necessary to be a licensed member of this State's Bar.  Therefore, even though this Court shares jurisdiction with the State Bar in matters involving attorney discipline, *see* N.C.G.S. § 84-36, the Court declines to exercise that jurisdiction here, opting instead to refer this matter of general impropriety to the State Bar to consider Russell's transgressions in a manner consistent with the North Carolina Rules of Professional Responsibility and its prior decisions, *see In re Nw. Bonding Co.,* 16 N.C. App. 272, 275 (1972) ("[Q]uestions relating to the propriety and ethics of an attorney are ordinarily for the consideration of the North Carolina State Bar."); *Swenson v. Thibaut*, 39 N.C. App. 77, 109 (1978) (stating that "while the interests of the [courts and the North Carolina State Bar] having disciplinary jurisdiction may, and often do, overlap, they are not always identical").

68.    For these reasons, Plaintiffs' Motion for Sanctions is GRANTED, and the Court, in the exercise of its discretion, hereby ORDERS as follows:

  a. Defendant Russell shall be personally responsible for paying the costs, including reasonable attorneys' fees, incurred by Plaintiffs, the Association, the New Entities, and Jurgens related to this Motion, including, but not limited to: the costs of filing, briefing (including

supplemental filings), and hearing the Plaintiffs' Motion; and the costs associated with Walton's services and testimony.

b. By 8 March 2022, Plaintiffs and the remaining Defendants shall each file a petition with supporting materials sufficient to allow the Court to make findings with respect to the amount and reasonableness of the costs assessed. *See, e.g., Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 244 (2013); *Couch v. Priv. Diagnostic Clinic*, 146 N.C. App. 658, 672 (2001).

c. By 28 March 2022, Defendant Russell may file her responses to the petitions filed.

d. Evidence of Russell's misconduct with respect to the Laramie Emails as determined in this Order may be admitted at trial for impeachment purposes, notwithstanding whatever substantive evidentiary value it may also have.

e. Plaintiffs are directed to provide a copy of this Order to the North Carolina State Bar for its review and decision regarding further discipline under the laws and rules of this State.

IT IS SO ORDERED, this the 16th day of February, 2022.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases